**RIETH–RILEY CONSTRUCTION CO., INC., Appellant (Defendant Below),**

v.

**AUTO–OWNERS MUTUAL INSURANCE COMPANY, Appellee (Plaintiff Below).**

No. 3–1179A323.

Court of Appeals of Indiana, Third District.

Aug. 21, 1980.

Rehearing Denied Oct. 23, 1980.

David R. Melton, Thornburg, McGill, Deahl, Harman, Carey & Murray, South Bend, for appellant.

Robert J. Konopa, Thomas J. Hall, May, Oberfell, Helling, Lorber, Campiti & Konopa, South Bend, for appellee.

STATON, Judge.

Michael Troyer, while riding on his motorcycle, was struck and injured by a truck being driven by Robert Smith (Smith). The truck was owned by Robert Hunt (Hunt). In an out-of-court settlement,[1] Troyer was paid $100,000 by Auto-Owners Mutual In-

1. In addition to the $100,000 paid by Auto-Owners, Troyer was paid $38,000 by Liberty Mutual Insurance Company on behalf of Rieth-Riley and $2,000 by Farm Bureau Insurance Company on behalf of Robert L. Ernsberger, owner of L-Bob Gravel. In consideration of these payments, Troyer released each of these defendants from any further liability to him arising out of the accident and his complaint against them was dismissed with prejudice.

surance Company (Auto-Owners) on behalf of its insured, Hunt.

Auto-Owners was substituted as named plaintiff on the third party complaint of Hunt and Smith in their action for breach of a lease agreement against Rieth-Riley Construction Company, Inc. (Rieth-Riley). Auto-Owners alleged that the terms of the lease between Hunt and Rieth-Riley were in effect at the time of the accident and, as a result, Rieth-Riley was bound to procure public liability and property damage insurance on the leased truck.

By its payment of $100,000 to Troyer in settlement of the claims against Hunt and Smith, Auto-Owners claimed it had discharged a duty which was owed to its insured by Rieth-Riley, pursuant to the lease agreement with the company. It contended, therefore, that it was entitled to recover from Rieth-Riley the $100,000 it had paid to Troyer. The trial court found for Auto-Owners and against Rieth-Riley. It entered a judgment in the amount of $114,-785.93. This sum included interest and reasonable attorney fees incurred by Auto-Owners in its defense of Troyer's claim against Hunt and Smith.

On appeal, Rieth-Riley raises three issues for our consideration:

(1) Was there sufficient evidence to support the court's finding that the lease was in effect at the time of the accident?

(2) Did the court err in finding that the terms of the lease were sufficiently definite as to render Rieth-Riley liable for the breach of a contract to procure insurance?

(3) Were the damages awarded by the court excessive?

We affirm.

The facts relevant to our disposition of the case indicate that Rieth-Riley, a road construction company, leases a number of trucks from independent owners for seasonal road construction and repair work. For the 1974–1975 season, it had presented a form lease, prepared by the company, to a number of truck owners, including Hunt, on a "take-it-or-leave-it" basis.[2] Pertinent terms of this lease, signed by Hunt, are as follows:

### "TRUCK LEASE

"Robert L. Hunt , hereinafter known as Lessor, hereby leases to RIETH–RILEY CONSTRUCTION CO., INC., Goshen, Indiana, hereinafter known as Lessee, the following truck:

\*　　\*　　\*　　\*　　\*　　\*

"The Lessor agrees to provide fuel, lubrication, tires, all maintenance and upkeep, and to maintain said truck in good running order.

"The Lessee shall hire the driver and pay the driver's wages, unemployment and social security taxes, carry workmen's compensation insurance, and make withholding tax deductions. Said driver shall be an employee of Lessee.

"The Lessee shall pay Lessor truck rental as follows: Prevailing union rates

"The Lessee shall carry Public Liability and Property Damage on said truck and Lessor shall carry collision, upset, fire, theft, and other insurances on said truck.

"In the event of unsatisfactory performance of said truck, or upon due notice by either party, this lease may be terminated, and is terminated if truck is used other than for and under supervision of Lessee—Lease to be re-instated when truck next again is used under supervision of Lessee." (Emphasis supplied.).

At the time of the accident, Smith was hauling a load of sand in Hunt's truck from the L-Bob Gravel pit to the Rieth-Riley stockpiling operation. The sand was to be dumped in the yard and then used by Rieth-Riley in the preparation of paving materials for its road construction work.

---

**2.** A Rieth-Riley office supervisor testified that the company had leased trucks from about fifteen to twenty-five independent truck owners during the 1974–1975 spring and summer season.

## I.
### Sufficiency of Evidence

■ No request for findings of fact or conclusions of law was made and the trial court made none. Where no findings are made, the general judgment entered by the court is presumed to be based upon findings supported by the evidence. *Ray v. Goldsmith* (1980), Ind.App., 400 N.E.2d 176. In order to have found for Auto-Owners, the trial court must have concluded that Hunt's truck was under Rieth-Riley's supervision at the time of the accident and that the lease was, thereby, in effect. Rieth-Riley challenges this determination on appeal and argues that there is insufficient evidence to support the trial court's judgment.

Before directing our attention to the issues at hand, we note that "supervise" was given as a synonym for "superintend" in *Booth v. State* (1913), 179 Ind. 405, 100 N.E. 563, 565. There, the Court defined "superintend" as "to have the charge and direction of; especially some work or movement; regulate the conduct and progress of; responsible for; manage; supervise." Supervision is "an act of supervising." Black's Law Dictionary, 1290 (5th ed. 1979).

■ The company argues that Hunt's truck was not under its supervision while hauling sand from L-Bob Gravel to its stockpiling operation. It admits that the leased trucks were under its supervision and the leases were, thereby, in effect when the trucks were being used for certain types of jobs. Rieth-Riley contends, however, that stockpiling sand was not one of those jobs which was covered by the lease.

In making this argument, Rieth-Riley points to a complicated payment scheme whereby Hunt was paid by Ernsberger, the owner of L-Bob Gravel, on a per ton basis for the sand hauled from his pit. Ernsberger was, in turn, paid by Rieth-Riley for the sand hauled. The company claims that Hunt's truck was not under its supervision as it did not pay Hunt for the sand. Furthermore, it argued that it did not control Hunt's truck because it did not determine the amount of sand to be hauled, the hours to be worked or the route to be taken by Hunt's truck from L-Bob Gravel to the Rieth-Riley yard.

In reaching this conclusion that there was no Rieth-Riley supervision of Hunt during the stockpiling operation, the company overlooked a good bit of evidence. The record revealed that Rieth-Riley made the arrangements, including payment, for Hunt's trucks to haul sand from L-Bob Gravel to Rieth-Riley's yard. It kept detailed records and reports of the stockpiling operations which were then sent every several weeks to Hunt and Ernsberger.

Ernsberger testified that when Hunt's trucks came in to his pit during the season, he always knew they were hauling for Rieth-Riley. Hunt explained that he never hauled for anyone other than Rieth-Riley during the season. He said:

"Q Did you ever do any hauling where—were your trucks ever used for hauling [other than for Rieth-Riley] during the season in off-hours, after-hours or on weekends?

"A No.

    *    *    *    *    *    *

"A Like we work every day and when you are off—off-season; well, if you work, Rieth-Riley calls you and you have got to go back anyway. You can't go and say, 'Well, I'm going to work for you tomorrow.' You wait and see if Rieth-Riley is going to use you. They might want you today. Might call you at eleven o'clock, might want you to stay home until that evening before they call you in.

    *    *    *    *    *    *

"A Well, Rieth-Riley comes first."

Rieth-Riley dispatched Hunt's trucks by calling him or instructing his drivers. Once engaged in stockpiling, Rieth-Riley could and would tell Hunt's driver when to stop hauling sand and when to start working on another company project. In addition, Rieth-Riley could and would instruct his driver when to resume the stockpiling operations. Often the leased trucks were involved in stockpiling for part of the day and

then were sent by the company to a particular Rieth-Riley job site for the rest of the day.

The evidence indicated that Rieth-Riley exercised yet another type of supervision over the drivers of the independent truck owners. The company would not allow a driver to haul to its yard unless he was a member of the union. Upon occasion, it had refused to use a truck because the driver was not a union member.

In essence, Rieth-Riley is asking us to sift through the multi-volume record of evidence to ascertain whether Hunt's truck was "under the supervision" of Rieth-Riley at the time of the accident. This we will not do. In making a sufficiency determination, we are not at liberty to re-weigh the evidence, but may look only to that evidence which is most favorable to the appellee and the reasonable inferences to be drawn therefrom. *Endsley v. Game-Show Placements, Ltd.* (1980), Ind.App., 401 N.E.2d 768.

This Court cannot reverse on the basis of conflicting evidence. *Franks v. Franks* (1975), 163 Ind.App. 346, 323 N.E.2d 678, 680. In order for us to reverse the judgment of the trial court, the record must disclose that there are no facts or inferences drawn therefrom which support the trial court's judgment. *Shuee v. Gedert* (1979), Ind.App., 395 N.E.2d 804.

In viewing the evidence before us in the prescribed fashion, we conclude that there was a sufficient amount of evidence to support the judgment of the court. We, therefore, must agree with its conclusion that Hunt's truck was "under the supervision" of Rieth-Riley at the time of the accident and that the terms of the lease were, therefore, in effect.

## II.

### Contract Ambiguity

Rieth-Riley next argues that no valid contract to procure insurance was created by the terms of the lease as the parties had failed to agree upon the amount of insurance to be supplied.

It relies upon *Bulla v. Donahue* (1977), Ind.App., 366 N.E.2d 233 [3] for the proposition that "an oral or written contract of insurance requires a meeting of the minds of the parties upon the following essential elements of a contract: (1) the subject of insurance; (2) the risk or peril insured against; (3) the amount of coverage; (4) the limit and duration of the risk; and, (5) the amount of the premium to be paid." *Bulla, supra*, at 236. The Court determined that the measure of damages for the failure to procure a policy of insurance is the amount which would have been due under the policy that should have been obtained. *Bulla, supra*, at 237.

Rieth-Riley contends that a "fair and complete analysis of *Bulla* leads to the conclusion that a contract to procure insurance does not arise until the parties have agreed on the essential terms of the contract of insurance to be procured." While correct in its statement of the law of the case, Rieth-Riley blurs the distinction between the parties in *Bulla* and those in the case at hand. *Bulla* dealt with a dispute between an insurance agency and an individual who had relied upon that agency's expertise and knowledge for the procurement of a specified amount of insurance. Here, however, the contract was between two parties seeking to allocate the risk of loss to an insurance carrier, a common commercial arrangement. *See Morsches Lumber, Inc. v. Probst* (1979), Ind.App., 388 N.E.2d 284, 287.

The company contends that its lease with Hunt is ambiguous as to the amount of insurance to be procured. As such, it claims that a determination as to the proper amount of damages from a breach of this lease is impossible to make.[4] This argu-

---

**3.** In *Bulla*, an insurance agency was sued for failure to procure a specified amount of insurance on certain automobiles owned by the plaintiffs.

**4.** *Citing International Shoe Co. v. Lacy* (1944), 114 Ind.App. 641, 53 N.E.2d 636, Rieth-Riley reminds us that we cannot make contracts for the parties nor can we, under the guise of

ment has superficial appeal until one looks to the mechanisms of the lease formation and the resulting position of the parties.

Rieth-Riley drafted this lease. By its own admission, the lease was a form contract, an adhesion contract[5] presented to Hunt on a "take-it-or-leave-it" basis. There was no negotiation. In fact, there had never been any discussion with the fifteen to twenty-five truck owners as to the terms of the Rieth-Riley lease. Hunt[6] was no exception.

Rieth-Riley had both the power and the opportunity to draft the terms of the lease with such specificity as to preclude any potential dispute involving the interpretation of this provision. It apparently chose not to do so. The company, instead, used the same form lease, with its open-ended insurance provision, year after year for the leasing operations.

Now, when faced with a claim, it seeks to avoid the effect of the contract which it drafted by contending that the provision providing for the procurement of insurance is suddenly too ambiguous as to be binding. We will not allow Rieth-Riley to utilize such circuitous reasoning to escape the effect of its clear promise to Hunt to procure property damage and public liability insurance.

■ In interpreting a contract, the court will first look to the intent of the parties at the time the contract was made as disclosed by the language used to express their rights and duties. *Shahan v. Brinegar* (1979), Ind. App., 390 N.E.2d 1036. If the contract is ambiguous or uncertain in its terms, then extrinsic circumstances and rules of contract construction may be employed to help construe the contract and ascertain the intent of the parties. *Shahan, supra; Wills v. Gaff* (1963), 136 Ind.App. 21, 191 N.E.2d 41.

■ A point not covered by an express contract may be implied by the court in

carrying out the intention of the parties. *Coleman v. Chapman* (1966), 139 Ind.App. 385, 220 N.E.2d 285. Any ambiguities in a contract are to be strictly construed against the party who employed the language and who prepared the contract. *Colonial Mortgage Co. of Ind., Inc. v. Windmiller* (1978), Ind.App., 376 N.E.2d 529.

■ The Court in *Shahan, supra,* at 1041 further explained that, in determining the intention of the parties to a contract,

"[I]t is the court's obligation and duty to consider their intention in the light of the surrounding circumstances which existed at the time the contract was made. The court should consider the nature of the agreement, together with all the facts and circumstances leading up to the execution of the contract, the relation of the parties, the nature and situation of the subject matter, and the apparent purpose of making the contract. *Standard Land Corporation of Indiana v. Bogardus* (1972), 154 Ind.App. 283, 289 N.E.2d 803.

In construing a contract, we must adopt the construction which appears to be in accord with justice, common sense and the probable intention of the parties in light of honest and fair dealing. *McClain's Estate v. McClain* (1962), 133 Ind.App. 645, 183 N.E.2d 842.

■ It was established at trial that H & H Enterprises (H & H) was another of the independent truck owners used by Rieth-Riley on a seasonal basis. In the 1974–1975 season, it was involved in hauling sand from L-Bob Gravel to the Rieth-Riley yard. Ernsberger, the owner of L-Bob Gravel, testified that, in this stockpiling operation, the payment scheme to H & H was the same as that arranged by Rieth-Riley for Hunt.

It appears that Rieth-Riley acted in accordance with the terms of its lease with H

---

interpretation, supply provisions or impose obligations not assumed.

**5.** A "contract of adhesion" is a standardized contract imposed and drafted by a party of superior bargaining strength who relegates to the subscribing party only opportunity to ad-

here to the contract or to reject it. *See Freeman v. Commonwealth Life Ins. Co. of Louisville* (1971), 149 Ind.App. 211, 271 N.E.2d 177, 181, fn. 5 and the cases cited therein.

**6.** The record reveals that Hunt had a third grade education.

& H [7] by procuring property damage and public liability insurance on its two trucks. A Liberty Mutual Insurance Company policy, covering two H & H trucks and naming Rieth-Riley and H & H, as per the Endorsement, as the insured was introduced at trial. The policy's effective dates were February 1, 1975 to February 1, 1976; its limits on bodily injury liability and property damage liability were $1,000,000 each.

In response to a Request for Admissions, pursuant to Ind. Rules of Procedure, Trial Rule 36, Rieth-Riley stated:

"6. Rieth-Riley Construction Company, Inc. did procure public liability and property damage insurance on said truck which covered the liability, if any, of Robert L. Hunt and Robert Smith during such times as the "truck lease" was in effect and the truck was being operated by Hunt or his designated employee driver for and under the supervision of Rieth-Riley Construction Company, Inc., which case did not exist on June 6, 1975 and therefore the public liability and property damage insurance procured by Rieth-Riley Construction Company, Inc. on said truck does not cover the liability, if any, of Robert L. Hunt and Robert Smith to Michael F. Troyer for any injuries sustained by Troyer as a result of the above-referenced to collision."

TR. 36(B) instructs that "Any matter admitted under this rule is conclusively established unless the court on motion permits withdrawal or amendment of the admission." [8] By such an admission, Rieth-Riley has acknowledged its duty, pursuant to the lease with Hunt, to procure public liability and property damage insurance. The company had, in fact, procured this type of insurance for H & H, another of its independent trucker lessors during the period of time in which the motorcycle accident had occurred. It failed, however, to procure such insurance in accordance with its lease with Hunt.

*Bulla* instructs us that "the measure of damages in an action based upon failure to procure a policy of insurance is the amount which would have been due under the policy that should have been obtained." *Bulla, supra,* at 237. "In the light of the surrounding circumstances which existed at the time the contract was made," [9] it is not unreasonable to conclude that if Rieth-Riley had procured property damage and public liability insurance, pursuant to the lease, it would have been a policy similar to, if not identical with, H & H's policy. The $100,000 judgment, awarded to Auto-Owners, was well within the limits of such a policy.

Additionally, it is reasonable to assume that such a policy would have allowed for the recovery of attorney fees in the defense of the insured.[10] If Rieth-Riley had procured the policy, then Hunt, by virtue of his insurance company, Auto-Owners, would not have had to incur the expense of his defense. Rieth-Riley's insurance company would have had to have borne this expense.

Furthermore, Auto-Owners is also entitled to the pre-judgment interest awarded by the court. "The crucial factor in deter-

---

7. Rieth-Riley's lease with H & H for the 1974–1975 season was not in the packet of leases of the other independent truck owners offered into evidence. When asked if all the leases were included in the packet, the Rieth-Riley office supervisor explained that "it's possible" that some of the leases had been lost or thrown away in the years between the 1974–1975 leasing season and the trial. The packet consisted of less than half of the number of Rieth-Riley leases during this period. In response to a question as to whether Rieth-Riley leased trucks from H & H during this period of time, he said "it could be." While the company is now out of business, the evidence established that H & H had a working relationship with Rieth-Riley during that season. Ernsberger testified that H & H hauled sand from his pit for Rieth-Riley during 1974–1975.

8. We found no motion for withdrawal or amendment of this admission made by Rieth-Riley.

9. *Shahan, supra,* at 1041.

10. The policy, purchased by Rieth-Riley on H & H's trucks provided primary insurance for its named insured, Rieth-Riley and H & H, per the endorsement. The provision relating to fees stated "the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage."

mining whether to allow interest before judgment is whether the damages are complete and ascertainable as of a particular time in accordance with fixed rules of evidence and accepted standards of evaluation. *Brand v. Monumental Life Insurance Co.* (1979), Ind.App., 396 N.E.2d 417, 422.

Although the record is silent as to the date of Troyer's out-of-court settlement, we are persuaded, through interpolation, that it took place on November 29, 1978. This was the date, given by the court in its judgment, to be used in the computation of pre-judgment interest and in the assessment of attorney fees. On November 29, 1978, the $100,000 paid to Troyer by Auto-Owners on behalf of Hunt and Smith was "complete and ascertainable." We conclude, therefore, that Auto-Owners is entitled to the judgment in the amount of $100,000 together with interest thereon at the rate of eight percent per annum from November 29, 1978 to the date of the judgment, this sum being $4,311.11.

### III.

#### Excessive Damages

Rieth-Riley's final argument as to the excessiveness of damages is merely a repetition of its earlier contentions concerning the contract's ambiguity as to the amount of damages to be recovered from a breach of a contract to procure insurance. We have already discussed its claims at length and will not do so any further.

Judgment affirmed.

HOFFMAN, J., concurs.

GARRARD, P. J., concurs in result.