William F. KIRTLEY, Phyllis Kirtley and Thomas Garrison, Directors of The Pointe Services Association, Inc., and Terry Pierson, as a past director of The Pointe Services Association, Inc., Appellants (Defendants Below),

v.

Howard W. McCLELLAND, et al, Appellees (Plaintiffs Below).

The POINTE SERVICES ASSOCIATION, INC., Cross–Appellant (Defendant Below),

v.

Thomas A. BERRY, Esq., Cross–Appellee (As attorney and in trust for all Plaintiffs below).

No. 53A01–8912–CV–493.

Court of Appeals of Indiana, First District.

Oct. 31, 1990.

Opinion on Denial of Rehearing Feb. 12, 1991.

William H. Andrews, Michael L. Carmin, Cotner Andrews Mann & Chapman, Bloomington, for appellants.

Thomas A. Berry, Berry & Mills, Bloomington, David A. Reidy, Jr., Gosport, for appellees.

ROBERTSON, Judge.

For the purpose of simplifying the identity of the parties to this appeal, the appellant-defendants will be referred to as the directors or as Kirtley and the appellee-plaintiffs as the Pointe Service Association (PSA). The appellants, William Kirtley, Phyllis Kirtley, Thomas Garrison and Terry Pierson, present or past directors of The Pointe Services Association, Inc., a unit owner's association, appeal from a judgment rendered against them following the bench trial of a shareholders' derivative action. The judgment ordered payment in the sum of approximately $150,000, an accounting and transfer of funds, and ordered payment of attorneys' fees.

We affirm in part, reverse in part, and remand with instructions.

An overview of the basic facts shows that "the Pointe" is a planned residential community built around a golf course and situated on the shore of Lake Monroe. In 1974, Caslon Development Co., the original developer, created the resort community, starting with four independent condominium villages totaling about 250 units. Eventually, plans called for a total of about 1500 residences. To facilitate general community administration, Caslon subjected the development property to certain covenants and restrictions for the benefit of the community as a whole, incorporated PSA, an Indiana not-for-profit corporation, and delegated to PSA responsibility for:

> maintaining and administering the common areas and common facilities, administering and enforcing ... covenants and restrictions, establishing a procedure for assessing its members, and disbursing ... charges and assessments.

For the most part, PSA acts through its managing agent to perform these duties. It handles, for example, road maintenance, snow removal, general grounds maintenance, accounting services and repairs on the television system, all through contractors. PSA has no employees or equipment other than a television tower and antennae.

Caslon created two classes of membership in PSA as a means of maintaining control over the development process: class A consisted of the owners of units or residential lots while class B referred to the 1500 potential memberships held by Caslon. If all went as planned, Caslon would gradually relinquish control over PSA as well as ultimate financial responsibility [Caslon paid no dues but was to fund deficits in PSA's annual budget], such that

PSA, which had high fixed maintenance and security costs, would become self-funding. In any event, by the terms of the Declaration of Covenants, Conditions and Restrictions (Declaration) Caslon would be out of PSA by January 1, 1990.

However, by 1982, growth of the Pointe had stagnated. Only 344 units had been sold. Financial considerations caused Caslon's successor, Indun Realty, a subsidiary of Indiana National Corporation, to attempt to sell the development. A buyer for the entire project could not be found; but, the country club, 30 residential units, and the golf course were sold to Resort Management Association (RMA), a limited partnership formed by the directors. As part of the agreement to purchase, RMA became the managing agent of PSA.

Development at the Pointe remained slow. Kirtley became concerned that RMA's investment in the club could be devalued by the plans of potential purchasers of the remaining land and so entered into negotiations with Indun to purchase the undeveloped property at the Pointe. Once the purchase had been consummated, in December, 1982, Kirtley formed a partnership, Pointe Development Company (PDC), and conveyed the property to PDC. Indun assigned the 1500 PSA class B memberships to Kirtley who assigned them to PDC and elected appellants Kirtley, his wife Phyllis Kirtley and brother-in-law Pierson the new directors of PSA. PDC began making changes immediately to encourage the sale of additional units. Among the changes, PDC sold tracts to builders and then diverted part of the purchase price to PSA to fund the deficit.

Over time, discontentment grew among the unit owners who were unable to elect board members, had no say in PSA's decision-making, and were unable to exercise any control over PSA assessments or spending. As a consequence, a group of class A unitowners brought this action against the directors alleging a number of irregularities in the management of the Pointe. One of the points of contention concerns payment to RMA for mowing certain easements and other property shared with PSA. Another involves Kirtley's purchase and sale of television satellite equipment. The issues raised in this appeal are as stated hereafter.

### I.

Whether the court erred in denying defendant's motion to dismiss the second amended complaint where no Indiana statutory or common law authority exists for a shareholder's derivative suit against a non-profit corporation.

■ The directors argue first that the court below erred in denying their motion to dismiss in which they asserted that McClelland and the other plaintiffs, as members of a nonprofit corporation, lacked standing to maintain an action on behalf of the corporation. The directors emphasize the absence of express statutory authorization in the Indiana Not-for-Profit Corporation Act of 1971, Ind.Code 23–7–1.1, and case law addressing use of the derivative remedy by members of nonprofit corporations. They urge a narrow reading of Ind. Trial Rule 23.1, arguing that the language "shareholders" refers to "corporation" while "members" used in conjunction with "unincorporated association" refers solely to members of unincorporated associations.

But for being members of a not-for-profit corporation, PSA has stated a cause of action. The appellees have brought the action to recover losses the corporation wrongfully sustained through the allegedly improper actions of its officers and directors, a situation where relief ordinarily would be obtained through suit by the corporation acting to protect its property and interests but the corporation either actually or effectively refuses to institute suit on its own. Hence, the essence of the question before us is simply whether an equitable forum is available to a corporation formed for purposes other than pecuniary gain to redress injury to its property and interests.

Admittedly, few examples of derivative actions brought by members of not-for-profit corporations or incorporated associations can be found in Indiana case law, *but see, e.g., Consumers' Gas Trust Co. v. Quinby* (7th Cir.1905), 137 F. 882, *cert.*

*denied,* 198 U.S. 585, 25 S.Ct. 803, 49 L.Ed. 1174 even though corporations organized for purposes other than pecuniary gain have had legislative approval since at least 1901. *See e.g.* Rev.St. 1889, ch. 79 (Burns' Ann.St. 1901 § 4613). Nonetheless, we are convinced that equitable redress would have been available at common law for members of a nonprofit corporation or an incorporated voluntary association had such plaintiffs sought to utilize it.

First, there is nothing about the remedy itself which warrants distinctive treatment based upon corporate purpose, for a derivative action by nature has as its aim the non-pecuniary benefit of the corporation, not the individual stockholder or member. *Scott v. Anderson Newspapers, Inc.* (1985), Ind.App., 477 N.E.2d 553, *trans. denied;* J. Pomeroy, Equity Jurisprudence § 1090 (1941). A stockholder is permitted to sue on behalf of the corporation, not because his rights have been violated, but simply as a means of setting in motion the judicial machinery of the court. The stockholder commences the action and prosecutes it, but in every other respect the action is brought by the corporation; it is maintained directly for the benefit of the corporation and final relief when obtained belongs to the corporation. *Pomeroy,* § 1095; *Dotlich v. Dotlich* (1985), Ind. App., 475 N.E.2d 331, 339, *trans. denied.*

The stockholder plaintiff never has a *direct* interest in the subject matter of the controversy because he owns no estate, legal or equitable, in the corporation's property. He is permitted, notwithstanding the want of a direct interest, to maintain an action solely to prevent an otherwise complete failure of justice. Pomeroy, § 1095. Equity will not suffer a wrong without a remedy. *Dodd v. Reese* (1940), 216 Ind. 449, 462, 24 N.E.2d 995, 999. Jurisdiction of a court of equity does not depend upon the mere accident of the court having in some previous case granted relief under similar circumstances. *Id.* Consequently, courts of equity have granted relief even to a former shareholder of a merged corporation when its equity has been adversely affected by the fraudulent act of an officer or director and means of redress otherwise would be cut off by the merger. *Cf. Gabhart v. Gabhart* (1977), 267 Ind. 370, 392, 370 N.E.2d 345, 358.

In Indiana, standing is achieved by showing a personal interest in the corporation. *Wright v. Floyd* (1908), 43 Ind.App. 546, 86 N.E. 971. "Shareholders and stockholders in a corporation, or an interested member, may bring suit on behalf of the corporation to protect the interest of the corporation, and incidentally the interest of the members; but, in doing so, their interest must be shown ..." *Id.* at 548, 86 N.E. 971.

That such a remedy remains available to members of nonprofit corporations is reflected in the text of T.R. 23.1. This rule is broader than its federal counterpart, extending relief to "shareholders or members or holders of an interest in such shares or membership, legal or equitable, to enforce a right of a corporation or of an unincorporated association ..." Members of nonprofit corporations literally fall within this class; ownership of stock is not an express prerequisite for relief.

Furthermore, T.R. 23.1 expressly assures the availability of derivative actions brought by members of an unincorporated association, giving legal entity treatment to the association when historically, for formalistic reasons, it could not sue or be sued as a jural person at common law. *See, e.g., Lafayette Chapter of Property Owners Association v. City of Lafayette* (1959), 129 Ind.App. 425, 157 N.E.2d 287. Hence, the rule seeks to facilitate redress where formerly it did not exist, rather than restrict the assessibility of such a remedy.

Finally, the drafters did not explicitly limit T.R. 23.1 to for-profit corporations. The text suggests therefore that the derivative action was not perceived as a procedural vehicle created solely for the benefit of for-profit corporations.

The absence of a statutory procedure for initiating a derivative action by a not-for-profit corporation when one has been affirmatively provided for for-profit corporations does not require the conclusion that statutory authorization is a necessity either. A court of general jurisdiction has

inherent equitable power unless a statute either explicitly or by necessary implication provides otherwise. *State ex rel. Root v. Circuit Court of Allen County* (1972), 259 Ind. 500, 506, 289 N.E.2d 503, 507. The Not-for-Profit Corporation Act does not expressly bar derivative actions by members of a nonprofit corporation.

The directors assert that I.C. 23–7–1.1–65, 66 impart a legislative intent to vest oversight of nonprofit corporations exclusively in public officials. I.C. 23–7–1.1–65 makes an act in excess of a corporation's powers "avoidable at the instance of the prosecuting attorney ... in a direct proceeding instituted by him against the corporation." This section *permits* a prosecuting attorney, as a representative of the public, to sue the corporation when it acts beyond the scope of the powers conferred by charter. Neither § 65 nor § 66 (which authorizes the state attorney general to bring proceedings for dissolution) speaks to the enforcement of rights belonging *to the corporation* but of the public's interest in the affairs of the corporation. Neither section expressly or by unmistakable implication purports to preclude a shareholder or member from challenging the binding nature of a corporation's ultra vires act, a right belonging *to the member* at common law, *see Tatman v. Rochester Lodge No. 47 I.O.O.F.* (1929), 88 Ind.App. 507, 511, 164 N.E. 718, 720; Pomeroy, § 1093, or to seek a dissolution of the corporation for reasons other than those affecting the corporate charter.

Accordingly, having found nothing in I.C. 23–7–1.1 indicative of a legislative intent to preclude the courts from exercising equitable jurisdiction over actions initiated by members of a non-profit corporation, we conclude the derivative remedy is available. The trial court correctly determined that minority members of PSA have standing to sue.

## II.

Whether the court erred by permitting plaintiffs to litigate a cause of action not encompassed within any of the three versions of plaintiffs' complaint and not raised by a pre-trial order, motion or discovery.

■ At the heart of this issue is the classic tension between the lack of specificity in pleading and the notice pleading concept. In particular, we are dealing with the lost corporate opportunity as it pertains to the distribution of television signals which will be discussed at length in the next issue.

It appears from the record that PSA became aware, to some degree, that the directors had sold the distribution rights of the television signals to Pegasus, a cable television purveyor, during June of 1987. However, it also seems that the implications of that transaction did not dawn on PSA until very shortly before the trial began. As the trial progressed, and it became more apparent that the distribution of television signals was a matter in contention, the directors began objecting to this evidence as being outside of the pleadings. PSA countered that rhetorical paragraph 26 of the pleadings included the distribution of television signal issue. That paragraph reads:

> The defendants, PSA Directors, have breached their fiduciary duty to PSA and the PSA Class A Members by providing services, at PSA expense, to businesses owned or controlled by the PSA Directors or to builders who contract with PDC all contrary to Indiana law.

The trial court ruled that the television signal issue was within the scope of the pleadings. The directors made a continuing objection to the evidence.

The directors first argue that the filing of the second amended complaint was contrary to the provisions of T.R. 15(A) which requires leave of court before filing second or subsequent amended complaints. No such leave was obtained by PSA. Our review of the record does not show that the directors objected to the filing of the second amended complaint. If that is so, we are faced with an invited error situation. A party may not take advantage of error which is the natural consequence of his neglect. *Stolberg v. Stolberg* (1989), Ind. App., 538 N.E.2d 1.

Additionally, the directors did not seek a continuance when faced with the trial court's ruling that the television signal distribution issue was to be tried. When a party objects to evidence because it is outside the issues raised by the pleadings, the question of the utility of a continuance arises. *Ayr–Way Stores, Inc. v. Chitwood* (1973) 261 Ind. 86, 300 N.E.2d 335. A portion of a motion for a continuance would have been dedicated to showing on the record what specific prejudice would occur to the movant by the addition of a new theory of the case. *Id.* Obviously we now are denied on review the opportunity to measure the exact harm arising from the directors' claim. Furthermore, when the objecting party bases a claim of prejudice on the argument that he was not prepared to meet the new theory, the proper course for the trial court is to allow an amendment to the pleadings and grant a continuance to allow for adequate preparation to defend against the new theory of recovery. *Bank of New York v. Bright* (1986), Ind.App., 494 N.E.2d 970; T.R. 15(B). A failure to request the continuance under these circumstances has been held to constitute a waiver of the issue. *Id.*

Hindsight would allow the observation that neither party handled this matter very well when it came to observing the letter and spirit of T.R. 15(A) and (B).

One other observation about this issue is that the purpose of T.R. 15(A) and (B), within the context of the directors' argument, is to protect a party from being placed at a serious disadvantage. *Bright*, 494 N.E.2d 970. The directors fail to make a convincing argument as to how they were harmed. It would appear from the record that they had the opportunity to present the desired evidence to defend against the television signal distribution claim. That being the case, no error exists on this issue.

### III.

Whether appellant Kirtley breached a fiduciary duty to PSA by appropriating a

corporate opportunity when he upgraded the existing television reception system, provided PSA with satellite based cable television and sold the equipment he had purchased with a covenant not to compete to an independent cable company.

■ The question arises as a consequence of Kirtley's dual role as developer and director/officer. Kirtley wanted to furnish the development with certain amenities which would enhance the resort image and the desirability of the community overall. Television reception without an unsightly array of antennae was one amenity assured the Pointe residents by Caslon.

Caslon precluded individual unit owners from maintaining outside antennae through the Declaration, which encumbered the entire property making up the Pointe. Caslon then purchased and installed master antennae on developer-owned property, laid cable to the exterior of the units, sold the antennae and tower to PSA on contract at 8% interest, and granted PSA an easement to maintain the system. Hence, PSA owned equipment and provided off air television service to its members.

During the first year of the directors' ownership, it became apparent that the off air set up designed by Caslon was not meeting member expectations. Indun had contacted cable television purveyors to determine whether cable television could be provided members, many of whom were investors, at a rate they were willing to pay. Indun's research indicated that members would agree to a $5.00 per month increase in their assessment for cable television but the lowest proposal called for a $7.50 increase per month. After surveying the members to determine whether two-thirds of them would be willing to pay $5.00 per month for four cable channels, Kirtley took it upon himself to upgrade the system, purchasing top-of-the-line modulators, receivers, converters and satellite dishes.

Instead of selling the system to PSA as Caslon had done, Kirtley operated it himself.[1] Kirtley, through PSA, billed the unit

---

1. Art. II, § 3 of the Declaration reserves in the   developer the right, but not the obligation, to

owners at the agreed rate which was commercially reasonable and far below the prevailing market rate. Kirtley therefore had no conflict of interest in the provision of service itself which would render the transaction void or voidable. I.C. 23–7–1.1–61. *See also, Schemmel v. Hill* (1930), 91 Ind. App. 373, 169 N.E. 678.

PSA maintains, however, that Kirtley was obligated at the time he purchased the equipment and began operating the system to obtain the opportunity for PSA as PSA had historically provided television reception service to its members. A corporate fiduciary may not appropriate to his own use a business opportunity that in equity and fairness belongs to the corporation. *Hartung v. Architects Hartung/Odle/Burke* (1973), 157 Ind.App. 546, 555, 301 N.E.2d 240, 243. *Tower Recreation, Inc. v. Beard* (1967), 141 Ind.App. 649, 652, 231 N.E.2d 154.

*Guth v. Loft, Inc.* (1939), 23 Del.Ch. 255, 5 A.2d 503 contains the classic statement of a corporate opportunity:

> [W]hen a business opportunity comes to a corporate officer or director in his individual capacity rather than in his official capacity, and the opportunity is one which, because of the nature of the enterprise, is not essential to his corporation, and is one in which it has no interest or expectancy, the officer or director is entitled to treat the opportunity as his own, and the corporation has no interest in it, if, of course, the officer or director has not wrongfully embarked the corporation's resources therein ... On the other hand, ..., if there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an interest or a reasonable expectancy, and, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of his corporation, the law will not permit him to seize the opportunity for himself.

convey to PSA such recreational facilities and

And, if, in such circumstances, the interests of the corporation are betrayed, the corporation may elect to claim all the benefits of the transaction for itself, and the law will impress a trust in favor of the corporation upon the property, interests and profits so acquired.

5 A.2d at 510–11.

Briefly summarized, the undisputed evidence of record establishes that Kirtley learned of the need for cable television service in his capacity as director/officer of PSA; that PSA was in the business of providing services to its members, among them television reception; and that PSA was about to obtain cable television for its members when the opportunity to provide it arose. The factual issue seems to center upon whether PSA had the capacity both financially and technically to take advantage of the opportunity. The trial court made numerous findings of fact but ultimately found that PSA had the corporate and financial capacity to provide the service which Kirtley supplied in 1983 and 1984.

A complaint alleging a breach of fiduciary duty by converting a corporate opportunity to the fiduciary's benefit places upon the plaintiff the initial burden of establishing that the fiduciary attempted to benefit from a questioned transaction. Once that burden has been met, the law presumes fraud and the burden of proof shifts to the fiduciary to overcome the presumption by showing that his actions were honest and in good faith. *Dotlich*, 475 N.E.2d at 342.

In essence, the trial court found against Kirtley on the issue upon which he had the burden of proof. Hence, he may not question the sufficiency of the evidence to support the findings but may challenge the judgment only as being contrary to law. *Id.* On appellate review, we must accept the trial court's fact-finding, without reweighing the evidence or reassessing the credibility of witnesses, unless the facts and judgment are clearly erroneous. *State Election Bd. v. Bayh* (1988), Ind., 521 N.E.2d 1313, 1315. Indeed, the trial court will not be reversed upon the evidence unless there is a total lack of supporting evidence or the evidence is undisputed and

other amenities as it deems desirable.

leads only to a contrary conclusion. *Id.; Dotlich,* 475 N.E.2d at 453.

Although there is evidence tending to show that Kirtley purchased the satellite cable system believing at the time that PSA was unable to acquire the system itself without his financial assistance and that it would ultimately be in the best interests of the unit owners to keep assessments as low as possible in order to promote sales, the record also shows that the planned development concept undertaken by Kirtley contemplated developer deficit funding regardless of major capital expenditures financed by member assessments and reserves. The Declaration permits increases in annual assessments and special assessments for the purpose of defraying replacement costs of a capital improvement. PSA had 344 assessment paying members at the end of 1983. The evidence showed Kirtley made $10,367 in profit in the six months he operated the system. The equipment and engineering support cost him $13,157. With the increased assessment of $5.00 per unit per month approved by the directors for 1984, the system and costs of operation would have paid for themselves in less than a year. The effect upon unit sales as compared to the third party purveyor method surely would have been negligible. Moreover, it is undisputed and the trial court found that PSA's options simply were not explored or considered. Though Kirtley had no duty to finance the project, Caslon, a subsidiary of Indiana National Corp., was willing to finance the first system at a rate advantageous to the members. Another investor might have emerged had PSA actively sought one. As for technical expertise, Kirtley acquired it by paying for it. PSA could have taken the same approach. After all, it had Kirtley's skills, as a director and through RMA.

Kirtley argues that the trial court's special findings are inadequate to sustain the judgment because the court failed to state specifically the opportunity misappropriated by Kirtley and the resulting breach of fiduciary duty. This argument refers at least in part to PSA's contention that Kirtley misappropriated both a corporate opportunity and a corporate asset, namely, PSA's distribution rights when Kirtley exchanged, on behalf of PSA, the exclusive right to distribute cable television at the Pointe for a service contract with Pegasus on the same day he sold his equipment and a covenant not to compete for $120,000.

Whether a trial court's findings of fact are adequate depends upon whether they are sufficient to disclose a valid basis under the issues for the legal result reached in the judgment and whether they are supported by evidence of probative value. *Ridenour v. Furness* (1987), Ind.App., 504 N.E.2d 336, 339, *affirmed and vacated,* 514 N.E.2d 273; *College Life Insurance Co. v. Austin* (1984), Ind.App., 466 N.E.2d 738, 742. Although conclusions of law are useful in delineating the theories upon which the trial court relied, as a general rule they do not change our scope of review which is to affirm the trial court on any possible basis supported by the factual findings. *Havert v. Caldwell* (1983), Ind., 452 N.E.2d 154, 157.

The trial court's factual findings, all supported by the record, that PSA owned the off air system and cable distribution at the Pointe;[2] that Kirtley purchased his system and began providing service while bids were being accepted and negotiations were being conducted; that Kirtley provided service without a written contract or disclosing to class A members that he was supplying the service to which they had subscribed; that the total cost of installation and amounts due signal providers was significantly less than yearly assessments or the balance of Indun funding after proper credits; and that the PSA directors gave no consideration to obtaining either authorization for a capital assessment to purchase the equipment or financing for the purchases as Caslon had done, disclose a valid basis for concluding that Kirtley appropriated an opportunity belonging to PSA by purchasing and placing in operation satellite receiving equipment. Profits generated from the operation of the system are

2. The evidence shows PSA controlled the distribution and that it owned the tower and antenna. Whether it also paid for the cable and installation is not apparent from the record.

benefits of the transaction itself which would have accrued to PSA had Kirtley not diverted the opportunity to himself.

■ Kirtley maintains that monies received on the sale of the equipment and covenant not to compete do not belong to the corporation. The trial court awarded PSA $117,210, the total profit on the operation and sale, on the theory that the noncompetition agreement was a sham and the $100,000 paid for it was akin to a premium or commission for bringing PSA's business to Pegasus. Kirtley insists that the evidence does not support the trial court's findings in that there is no evidence PSA had exclusive rights to distribute the cable signal *at the Pointe.*

We have carefully considered this contention and Kirtley's assertion that the noncompetition contract had value independent of the exclusive right to distribute given by PSA, and agree. The record does not sustain the trial court's ultimate findings in this regard.

The trial court's conclusions of law on this issue are as follows:

> William Kirtley signed the PSA Cable Television Services Contract and the Sales Contract with Pegasus. The PSA contract giving Pegasus the exclusive right to operate a cable television system on The Pointe renders Kirtley's covenant not to compete with Pegasus at The Pointe worthless. Quite simply, Kirtley had nothing to sell. He was precluded from competing at The Pointe with Pegasus by the exclusive right given to Pegasus by PSA. Craig Brubaker of Pegasus testified that he pays a premium to a developer for the right of distribution and the amount is based on the anticipated profits to be made. It is in the nature of a "commission" or a "finders fee." The inclusion of a non-compete clause in the Sales Contract was nothing more than a means to pay William Kirtley for bringing PSA's business to Pegasus. William Kirtley intentionally appropriated PSA's fee for himself and did not in good faith and openly deal with the corporation and its members.

3. After the sale in December, 1982, PDC and RMA held better than two-thirds of the real

The trial court's conclusions are supported by the critical factual finding that the PSA/Pegasus contract "acknowledged that PSA 'controls the distribution of cable television signals' at The Pointe and by its terms grants to Pegasus 'the exclusive right ... to operate a cable television system' at The Pointe."

What the PSA/Pegasus contract says is that PSA "controls the distribution of cable television signals within certain real estate located in Monroe County, Indiana, upon which real estate is located a complex of individual residential units *generally and commonly known as* the Pointe." (Emphasis supplied.) By the terms of the PSA/Pegasus contract, PSA controls distribution to a complex of individual residential units; it does not control distribution to all of the property subjected to the Declaration, including undeveloped land held by PDC.[3] Indeed, PSA exercises power of administration only over the common areas and common facilities, defined by the Declaration as "all real property owned by the Association for the benefit, use and enjoyment of its members and all facilities and real property leased by the Association or wherein the Association has acquired rights by means of contract or this Declaration." Cable "facilities" as they existed extended only to completed units. Though zoning requirements might stand in PDC's way, nowhere in the Declaration or the warranty deed did Caslon restrict the Pointe residential community to owner occupied condominium units. While owners of "units" or "lots" automatically acquire class A membership, PDC is expressly excepted. It pays an assessment only on rental "units." As the record indicates, other options, such as a trailer park, though not attractive to RMA, exist for the land. And, PDC owns the common roadways reaching the undeveloped tracts.

Hence, a sizable potential secondary market does exist at the Pointe. Kirtley's agreement not to compete with Pegasus "in the operation of a satellite cable tele-

estate at the Pointe.

vision system in the residential properties developed at the Pointe" has value and may have had value to Pegasus' Brubaker who contracted with PSA with the expectation "that it was going to be a growing market."

The record therefore does not support the trial court's conclusions that Kirtley had nothing to sell and his covenant not to compete was worthless. Whether the $100,000 paid Kirtley also included a commission for bringing PSA business to Pegasus we cannot discern from the record. No one asked Brubaker why he offered $100,000 above the price of the equipment. We will not speculate solely based upon the testimony of Brubaker, that incentives are sometimes paid to the developer by Pegasus, that one actually was paid here.

The trial court erred in its determination that the $120,000 from the sale of the equipment and covenant not to compete belonged to PSA. It was correct, however, in awarding PSA the $10,367 profit Kirtley made operating the system.[4]

### IV.

Whether the court erred by enforcing a covenant in the golf course deed of conveyance from Indun to RMA, requiring RMA to maintain at its expense the non-paved area of an easement granted it by Indun.

■ At trial, PSA maintained that the directors breached their fiduciary duties to the corporation by expending sums for mowing easements which RMA was required to maintain at its own expense. In support of this position, PSA offered the warranty deed which conveyed the golf course subject to the easements granted PSA. That deed contains the following provision:

Grantor hereby also grants and transfers to Grantee, for the benefit of the Real Estate conveyed hereby, a private, non-exclusive surface easement for the purpose of affording Grantee ... necessary

access to the Real Estate upon and across the easements ... (The "Roadway Easements") heretofore granted by Grantor or its predecessor, Caslon Development Company, to the Pointe Service Association, Inc. By its acceptance of this Deed, Grantee agrees to mow the grass upon, and otherwise maintain in a sightly appearance, the nonpaved portions of said Roadway Easements.

Kirtley acknowledges the duty to mow the easement but claims that the parties intended to provide for mowing without shifting the expense. Kirtley also argues that PSA, not being a third party beneficiary to the agreement to mow, had no standing to enforce the covenant.

The trial court found the covenant to be clear and unambiguous in requiring RMA to mow the roadway easement at its own expense. It also concluded from the warranty deed, Declaration and PSA's easements that PSA stands "in the position of a third-party beneficiary of the mowing condition to which RMA's Roadway Easement is subject."

The object of deed construction is to ascertain the intent of the parties. *Brown v. Penn Central Corp.* (1987), Ind., 510 N.E.2d 641, 643. Where there is no ambiguity in the deed, the intention of the parties must be determined from the language of the deed alone. *Id.* However, it is the court's obligation and duty in determining the intention of the parties to consider their intentions in the light of the surrounding circumstances which existed at the time it was made. The court should consider the nature of the agreement, together with all facts and circumstances leading up to the execution of the contract, the relation of the parties, the nature and situation of the subject matter, and the apparent purpose of making the contract. *Rieth–Riley Construction Co. v. Auto–Owners Mutual Ins. Co.* (1980), Ind.App., 408 N.E.2d 640, 645 (citing *Standard Land Corp. v. Bogardus* (1972), 154 Ind.App. 283, 289 N.E.2d 803, 823.)

**4.** We reach this conclusion without assessing any weight to Brubaker's testimony that he never pays a homeowners' association for the right to distribute cable television signals. The con-

sideration for the right comes in the form of the rate to be paid and the level of service to be provided.

Kirtley points out that the deed does not state in explicit terms that the cost of mowing was to be assumed by RMA. But by necessary implication, it was part and parcel of the conveyance of the easement. Had the parties intended any other arrangment, the deed either would have been silent, leaving the arrangement a matter of contract, or it would surely have stated that responsibility for maintenance of the *nonpaved* portions of the easement was to be shared. We agree with the trial court that no other reasonable interpretation can be accorded the language of the deed.

Our conclusion is underscored by the circumstances existing at the time the sale transpired. As part of the sale of the golf course to RMA, Indun agreed to transfer the golf course mowing equipment which it had been using since 1975 to mow areas where the playable golf course did not meet the access roads. (This situation occurred at least 50% of the time.) Indun had already conveyed to PSA the roadway easements with the responsibility for maintaining the road surface but because of the proposed sale to RMA, Indun no longer would have access to the special equipment and high-powered mowers needed to maintain the grassy and rocky areas adjacent to the roadways but part of the easement. Testimony from the golf course superintendent established that it was fairly easy for golf course employees to take a path wide enough to pick up the areas along the road when they mowed the golf course. Given the ease of maintenance for RMA and its possession of the equipment, it makes sense that Indun would transfer responsibility for the nonpaved portions of the easement to RMA as consideration for the easement.[5]

■ Similarly, we are of the opinion that the trial court correctly determined PSA to be a third party beneficiary of the agreement. One not a party to an agreement may nonetheless enforce it by demonstrating that the parties intended to protect him under the agreement by the imposition of a duty in his favor. *Garco Industrial Equipment Co. v. Mallory* (1985), Ind. App., 485 N.E.2d 652, 654, *trans. denied.* To be enforceable, it must clearly appear that it was the purpose or a purpose of the contract to impose an obligation on one of the contracting parties in favor of the third party. *Jackman Cigar Manufacturing Co. v. John Berger & Son Co.* (1944), 114 Ind.App. 437, 445, 52 N.E.2d 363, 367. It is not enough that performance of the contract would be of benefit to the third party. It must appear that it was the intention of one of the parties to require performance of some part of it in favor of such third party and for his benefit, and that the other party to the agreement intended to assume the obligation thus imposed. *Id.* The intent of the parties should be gathered from the terms of the contract itself, considered in its entirety against the background of the circumstances known at the time of execution. *Id.; see also, Mogensen v. Martz* (1982), Ind.App., 441 N.E.2d 34, 35. However, the intent of the parties to benefit a third party is not to be tested by a rule any more strict or different than their intention as to other terms of the contract, *Freigy v. Gargaro Co., Inc.* (1945), 223 Ind. 342, 349, 60 N.E.2d 288, 291 (citing *Nash Engineering Co. v. Marcy Realty Corp.* (1944), 222 Ind. 396, 416, 54 N.E.2d 263, 271); it can be shown by specifically naming the third party or by other evidence. *Russell v. Posey County Dept. of Public Welfare* (1984), Ind.App., 471 N.E.2d 1209, 1211, *trans. denied.*

At the time of the Indun–RMA conveyance, PSA had responsibility for maintaining the central road system, and the common areas and facilities. Consequently, Indun, which had control of PSA at the time by its class B membership, must have been bargaining for PSA. Furthermore, as the trial court observed, Indun envisioned own-

---

**5.** We acknowledge the testimony in the record concerning Indun's oral agreement with RMA but have not considered it in resolution of this issue for, as the trial court observed, in the absence of fraud or mistake, all prior or contemporaneous negotiations or executory agreements, written or oral, leading up to the execu-

tion of a deed are merged therein by the grantee's acceptance of the conveyance in performance thereof, and any variance or inconsistencies therein must yield to the language of the last document. *Stack v. Commercial Towel & Uniform Service, Inc.* (1950), 120 Ind.App. 483, 492, 91 N.E.2d 790, 794.

ership of the roadways by PSA. It demonstrated this intent expressly in the Declaration. In light of these circumstances, it is apparent that Indun not only intended to benefit PSA, it intended to impose an obligation in favor of PSA. Indeed, any benefit accruing to Indun was indirect at best because, whether by virtue of the easements or the Declaration, Indun intended and did delegate maintenance of the Roadway Easements to PSA.

For these reasons, we conclude the trial court correctly determined that the directors wrongfully expended PSA funds for mowing expenses, thereby breaching a fiduciary duty to the corporation.

### V.

Whether the trial court erred in compounding prejudgment interest.

Since we reverse on the third issue, resulting in a change of the money judgment, the need to recalculate prejudgment interest exists. The trial court is directed to the following from *Northern Indiana Public Service Co. v. Citizens Action Coalition* (1989), Ind., 548 N.E.2d 153, 161, *dismissed*, 476 U.S. 1137, 106 S.Ct. 2239, 90 L.Ed.2d 687:

> The Court of Appeals addressed the issue of compound interest as damages in *Indiana Telephone Corp. v. Indiana Bell Telephone Co.* (1977), 171 Ind.App. 616, 638, 641, 360 N.E.2d 610, 612 (on rehearing), and quoted from 11 *Williston on Contracts*, § 1417 at 638 (3d ed. 1968): "The general rule is that compound interest is not allowed as damages." We adopt that general rule, and since the interest award here is based on the right to receive interest as damages, we hold that the interest should not be compounded but calculated as simple interest.

The trial court should compute the prejudgment interest herein accordingly.

### VI.

Whether the court erred in ordering defendants to reimburse PSA for attorneys' fees incurred in defending this cause where no evidence of such expense was introduced and where defendants were entitled to indemnification pursuant to Indiana statute and within the terms of the Declaration and PSA By-laws.

The trial court made an award of a little over $60,000 in attorneys' fees to the property owners which was to be paid by the directors. The primary factors prompting the attorneys' fees appear to be the directors' intentional breach of their fiduciary duty and willful misconduct in performing their duties. Because we reverse the trial court on the distribution of television signals question, a substantial change in the award of attorneys' fees is required. As a result, we remand on this issue with instructions to hold a hearing and receive evidence from both sides on the matter of attorneys' fees.

PSA raises two issues on cross-appeal:

### VII.

The trial court incorrectly failed to award [PSA] damages for PSA funds improperly spent by PSA directors to provide security services to non-PSA businesses in which PSA directors had an interest.

■ We note that PSA appeals from a negative judgment on this issue and that the issue can only be attacked as contrary to law. The trial court's judgment will be affirmed if it is sustainable on any legal theory. *Naderman v. Smith* (1987), Ind. App., 512 N.E.2d 425.

The facts show that the nighttime security guards were paid by PSA and that they patrolled the entire complex which included property owned by PDC and others. PSA sought reimbursement for their security expenditures to the extent that nighttime security benefited other parties. The trial court made a finding that PDC and others had benefitted from the security patrols but the evidence on the calculation of damages was "problematic" and, as a result, no damages were awarded to PSA on this issue.

On appeal, PSA argues several possible theories or formulas which could have been used to reach a dollar amount for damages. It is our observation that the evidence presented by PSA on this issue failed to

provide plausible theories to support a calculation of damages.

In reference to the trial court's finding that damages were not susceptible of calculation we believe that the following, from *Indiana University v. Indiana Bonding & Sur. Co.* (1981), Ind.App., 416 N.E.2d 1275, 1288, is appropriate:

> To support an award of compensatory damages, facts must exist and be shown by the evidence which afford a legal basis for measuring the plaintiff's loss. The damages must be susceptible of ascertainment in some manner other than by mere speculation, conjecture or surmise and must be referenced to some fairly definite standard, such as market value, established experience, or direct inference from known circumstances. (Citations omitted.)

A review of the evidence on this issue sustains the trial court's finding.

## VIII.

The trial court erroneously refused to consider PSA's request for treble damages.

In its motion to correct error, PSA made a request for treble damages pursuant to I.C. 34-4-30-1. This was the first mention of treble damages in the course of the proceedings. PSA defends this belated request, in part, on the basis that it did not know of Kirtley's appropriation of the television signal fees to himself until the second day of trial. Previously recounted facts would indicate that PSA was aware of the situation somewhat earlier than after final judgment.

It is fundamental that a party may not raise an issue in the motion to correct error which was not raised in the trial court. *Allen v. Scherer* (1983), Ind.App., 452 N.E.2d 1031. PSA's failure to timely advise the trial court of its request for the treble damages must result in waiver.

## CONCLUSION

We reverse the judgment insofar as it awards damages associated with the sale of cable television distribution rights. We reverse and remand with instructions to hold a hearing on attorneys' fees. We affirm in all other respects.

RATLIFF, C.J., and MILLER, J., concur.

## OPINION ON REHEARING

ROBERTSON, J.

The petitions for rehearing filed by the appellant and appellee are in all things denied. We write only for the purpose of clarifying that it was and is our intent, as stated in the majority opinion, to remand the cause to the trial court for plenary consideration of all attorney fee questions.

RATLIFF, C.J. and MILLER, P.J., concur.