James ROSE and Robert Underwood, Appellants–Defendants,

v.

MERCANTILE NATIONAL BANK OF HAMMOND, J.R. Construction Co., and Joseph Ramacci, Appellees–Plaintiffs.

No. 56A03–0405–CV–235.

Court of Appeals of Indiana.

March 31, 2006.

Kathryn D. Schmidt, Burke Costanza & Cuppy LLP, Merrillville, for Appellants.

Michael L. Muenich, Highland, for Appellees.

## OPINION

MAY, Judge.

James Rose and Robert Underwood appeal the trial court's judgment in favor of Mercantile National Bank of Hammond, as Trustee under Trust Agreement dated June 25, 1975, known as Trust No. 3346, J.R. Construction Co., and Joseph Ramacci (collectively, "Mercantile"). Rose and Underwood raise seven issues, which we consolidate and restate as:

1. Whether the trial court erred in denying Rose and Underwood's motion for change of venue from the judge;

2. Whether the trial court erred in allowing Mercantile to amend the complaint to add a count for treble damages;

3. Whether the trial court erred by denying Rose and Underwood a jury trial on the issue of treble damages;

4. Whether the trial court erred in finding Rose and Underwood violated the Uniform Fraudulent Transfer Act;

5. Whether the trial court erred by awarding treble damages and attorneys fees pursuant to Ind.Code § 34–24–3–1; and

6. Whether the trial court's award of attorney fees was an abuse of discretion.

We affirm in part, reverse in part, and remand with an instruction.

## FACTS AND PROCEDURAL HISTORY

Jasper Newton Utility, Inc. ("Jasper") was a sub-chapter S corporation with fifty percent of its common stock owned by Rose and fifty percent owned by Underwood. In 1978, Jasper entered into an agreement with Mercantile whereby Jasper agreed to provide sewage disposal for a development owned by Mercantile, including service to a 4,000 square foot addition planned by Mercantile. Originally, Mercantile planned two retail stores for the addition. In 1995, however, Mercantile entered into an agreement to lease the entire addition as a restaurant.

On August 18, 1995, Mercantile requested sewer connections for the restaurant. Jasper denied the application for sewer service because the capacity requirement for the restaurant exceeded Jasper's capacity. On December 1, 1995, Mercantile filed a complaint against Jasper for mandate, damages, and specific performance under the 1978 agreement. The trial court conducted a bench trial on May 21, 1999, and took the matter under advisement.

On November 8, 2001, after numerous proceedings, the trial court heard oral argument on the parties' proposed findings of fact. On November 15, 2001, the trial court found in favor of Mercantile and entered a judgment against Jasper in the amount of $159,581.00. On December 17, 2001, Jasper filed a motion to correct error, which the trial court denied on De-

cember 20, 2001. On January 18, 2002, Jasper filed its Notice of Appeal. We affirmed the trial court's judgment in a memorandum decision on February 12, 2003. *See Jasper Newton Utility Co. v. Mercantile Nat. Bank*, 56A03-0203-CV-71, 783 N.E.2d 1282 (Ind.Ct.App. Feb. 12, 2003).

In the spring of 2000, while the original complaint against Jasper was pending, Darrin Yount contacted Rose regarding the acquisition of Jasper by Utilities, Inc. and its subsidiary, Water Services Company of Indiana, Inc. ("WSCI"). In May of 2000, Rose contacted Harry Zimmer of Utilities, Inc. and scheduled a meeting, presumably to discuss the sale of Jasper. In May or June of 2000, Yount and Zimmer inspected Jasper's facilities and reviewed its business records. Discussions between Rose and representatives of Utilities, Inc. continued through 2000. Rose provided Utilities, Inc. with various records and information regarding Jasper.

In the late fall and early winter of 2000, Jasper entered into negotiations with Carl Wenz of Utilities, Inc. regarding the sale of Jasper. On or about January 12, 2001, Rose executed an Asset Purchase Agreement on behalf of Jasper for the sale of Jasper's water and sewer utility assets for $470,000.00. Pursuant to the Asset Purchase Agreement, the closing would take place within thirty days of Indiana Utility Regulatory Commission ("IURC") approval of the sale.

In the summer of 2001, following published notice, the IURC conducted a public hearing regarding the sale of Jasper's assets. On November 20, 2001, the IURC approved the sale of Jasper's assets to WSCI.

On December 18, 2001, Jasper, and Rose and Underwood individually, executed an indemnity agreement in favor of WSCI. Pursuant to the indemnity agreement, Jas-

per, Rose, and Underwood, jointly and severally, agreed to

> protect, defend, indemnify and save harmless [WSCI] from and against all liabilities, obligations, claims, damages, penalties, causes of action, and other costs and expenses ... imposed upon or incurred by or asserted against [WSCI] by reason of ... [Mercantile's lawsuit]
>
> ....

(Appellants' App. at 299.)

Jasper and WSCI closed on the sale of Jasper's assets on December 18, 2001. Upon closing, WSCI paid Jasper approximately $470,000.00, which Rose deposited in Jasper's bank account at Kentland Bank. On December 20 or 21, 2001, Rose wrote two checks in the amount of $235,000.00 each against the funds in the Kentland Bank account. Rose made one check payable to Underwood and one check payable to himself. Rose and Underwood placed the funds in their respective personal accounts.

In March of 2002, Mercantile filed a motion for proceedings supplemental. On November 26, 2002, Mercantile filed a complaint for relief in aid of execution on judgment against Jasper as well as against Utilities, Inc., WSCI, Rose, and Underwood, as supplemental defendants. Mercantile sought to void the transfer of Jasper's assets to Utilities, Inc. and WSCI and to recover the $470,000.00 transferred from Jasper to Rose and Underwood pursuant to the Uniform Fraudulent Transfer Act, Ind.Code ch. 32–18–2.

In its complaint, Mercantile asserted that it was a creditor of Jasper pursuant to Ind.Code § 32–18–2–4, which provides "creditor means a person who has a claim." Mercantile claimed Jasper transferred its assets to WSCI and such transfer was fraudulent pursuant to Ind.Code § 32–18–2–14(1).[1] Mercantile further asserted Jasper's transfer to Rose and Underwood of the proceeds from the sale of Jasper's assets was fraudulent pursuant to Ind. Code § 32–18–2–14(1), Ind.Code § 32–18–2–14(2),[2] and Ind.Code § 32–18–2–15.[3] In its count against Rose and Underwood, Mercantile requested relief pursuant to

---

1. Ind.Code § 32–18–2–14(1) provides:
 A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation:
 (1) with actual intent to hinder, delay, or defraud any creditor of the debtor[.]

2. Ind.Code § 32–18–2–14(2) provides:
 A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation:
 \* \* \* \* \* \*
 (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
 (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
 (B) intended to incur or believed or reasonably should have believed that the debtor would incur debts beyond the debtor's ability to pay as the debts became due.

3. Ind.Code § 32–18–2–15 states as follows:
 A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if:
 (1) the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation; and
 (2) the debtor:
 (A) was insolvent at that time; or
 (B) became insolvent as a result of the transfer or obligation.

Ind.Code § 32–18–2–17[4] and Ind.Code § 32–18–2–18.[5]

Rose and Underwood moved for change of venue from the judge on December 17, 2002. The trial court denied the motion on December 30, 2002.

On January 17, 2003, Utilities, Inc. and WSCI filed a motion for summary judgment. On February 11, 2003, Rose and Underwood filed their answer to Mercantile's complaint but did not demand a trial by jury. On February 13, 2003, Mercantile filed a motion for summary judgment and response in opposition to Utilities, Inc. and WSCI's motion for summary judgment.

On February 14, 2003, Mercantile filed a motion for leave to amend its complaint to add a third count based on the same facts alleged in the initial complaint. In Count III, Mercantile sought compensation under Ind.Code § 34–24–3–1,[6] which permits a

---

4. Ind.Code § 32–18–2–17 provides in pertinent part:
 (a) In an action for relief against a transfer or an obligation under this chapter, a creditor, subject to the limitations in section 18 of this chapter, may obtain any of the following:
 (1) Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim.
 (2) An attachment or other provisional remedy against the asset transferred ....
 (3) Subject to applicable principles of equity and in accordance with applicable rules of civil procedure, any of the following:

 \* \* \* \* \* \*

 (B) Appointment of a receiver to take charge of the asset transferred or of the property of the transferee.

 \* \* \* \* \* \*

 (b) If a creditor has obtained a judgment on a claim against the debtor, the creditor, if the court orders, may levy execution on the asset transferred or its proceeds.

5. Ind.Code § 32–18–2–18 allows:
 to the extent a transfer is voidable in an action by a creditor under section 17(a)(1) of this chapter, the creditor may recover judgment for the value of the asset transferred, as adjusted under subsection (c), or the amount necessary to satisfy the creditor's claim, whichever is less. The judgment may be entered against:
 (1) the first transferee of the asset or the person for whose benefit the transfer was made[.]

6. Ind.Code § 34–24–3–1 provides:
 If a person suffers a pecuniary loss as a result of a violation of IC 35–43, IC 35–42–3–3, IC 35–42–3–4, or IC 35–45–9, the person may bring a civil action against the person who caused the loss for the following:
 (1) An amount not to exceed three (3) times the actual damages of the person suffering the loss.
 (2) The costs of the action.
 (3) A reasonable attorney's fee.
 (4) Actual travel expenses that are not otherwise reimbursed under subdivisions (1) through (3) and are incurred by the person suffering loss to:
 (A) have the person suffering loss or an employee or agent of that person file papers and attend court proceedings related to the recovery of a judgment under this chapter; or
 (B) provide witnesses to testify in court proceedings related to the recovery of a judgment under this chapter.
 (5) A reasonable amount to compensate the person suffering loss for time used to:
 (A) file papers and attend court proceedings related to the recovery of a judgment under this chapter; or
 (B) travel to and from activities described in clause (A).
 (6) Actual direct and indirect expenses incurred by the person suffering loss to compensate employees and agents for time used to:
 (A) file papers and attend court proceedings related to the recovery of a judgment under this chapter; or
 (B) travel to and from activities described in clause (A).
 (7) All other reasonable costs of collection.

person who suffers a pecuniary loss as a result of certain property crimes to seek treble damages and attorney fees. Mercantile alleged the defendants violated Ind. Code § 35–43–5–4, which defines criminal fraud.

On March 28, 2003, Jasper, Rose, and Underwood filed a response in opposition to Mercantile's motion for summary judgment. On April 7, 2003, Mercantile filed a reply in support of its motion for summary judgment, in which it contended it was "entitled to treble damages, costs, attorneys' fees, travel and other expenses, pursuant to Ind.Code § 34–24–3–1," (Appellants' App. at 110), as alleged in the third count of Mercantile's amended complaint.

On July 8, 2003, the trial court held a hearing on the motions for summary judgment. At that hearing, the court neither addressed nor heard argument on Mercantile's motion to amend the complaint because Rose and Underwood had not objected orally or by written motion in the four and a half months since Mercantile had filed the motion to amend. Furthermore, Rose and Underwood did not object at the hearing to Mercantile's argument regarding the treble damages claim asserted in the amended complaint.[7]

On July 23, 2003, Rose and Underwood tendered $181,300.00 to the Clerk of the Court.[8]

On July 24, 2003, the trial court entered findings of fact and conclusions of law in an order granting summary judgment to Mercantile. The court concluded:

8. As a matter of law, the payment of the sales proceeds to Rose and Underwood without a corresponding transfer of equivalent value from them, was a fraudulent transfer under Ind.Code § 32–18–2–14(2), which does not require a showing of fraudulent intent. A fraudulent transfer is conclusively established because the transfer was made without giving [Jasper] "a reasonably equivalent value in exchange for the transfer" and [Jasper]: (A) was engaged in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; and (B) intended to incur or believed or reasonably should have believed that it would incur debts beyond its ability to pay as the debts became due. Ind.Code § 32–18–2–14 (2002).

9. Because the undisputed evidence establishes that all of [Jasper], Rose, and Underwood, knew that the sale of [Jasper]'s assets and distribution of sales proceeds was effected in a manner to evade [Jasper]'s obligation to Plaintiffs, and in violation of Indiana corporate law concerning the distribution of assets, there is no genuine issue as to any material fact and Plaintiffs are entitled to a judgment as a matter of law on their fraudulent transfer claims against all of [Jasper], Rose, and Underwood.

10. Plaintiff's actual damages from the fraudulent transfer are One Hundred Eighty Thousand Eight Hundred Eleven Dollars and Eighty–Three Cents ($180,811.83), consisting of the original judgment amount of One Hundred Fifty Nine Thousand Five Hundred Eighty One Dollars ($159,581.00), plus accumulated post-judgment interest at the statutory rate of eight percent (8%), for simple interest of Twenty One Thousand Two Hundred Thirty Dollars and Eighty

---

7. On August 11, 2003, Rose and Underwood finally filed an objection to Mercantile's motion to amend its complaint.

8. On November 6, 2003, Mercantile filed a Statement of Partial Satisfaction of Judgment.

Three Cents ($21,230.83) as of July 15, 2003.

11. It is within this Court's discretion to determine the amount of damages that should be awarded when an action is brought by crime victim under treble damages statute. *Ballard v. Harman*, 737 N.E.2d 411 (Ind.Ct.App.2000)[, *reh'g denied* ]. The Court sets the Plaintiff's request for treble damages for further hearing and consideration on August 25, 2003 at 10:30 A.M.

12 Plaintiffs are also entitled to recover their costs, attorneys' fees, travel and other expenses, pursuant to Ind.Code § 34–24–3–1 for the pecuniary loss suffered as a result of Defendants' violation of Ind.Code § 35–43–5–4. The award of attorneys' fees is mandatory under Ind. Code § 34–24–3–1. *Patricia Ann Brown, C.P.A. v. Brown*, 776 N.E.2d 394 (Ind.Ct.App.2002)[, *trans. denied* 792 N.E.2d 36 (Ind.2003) ].

(*Id.* at 118–19.) Thus, all issues of fact raised in Mercantile's complaint and amended complaint were purportedly resolved on summary judgment, except for the amount to be awarded pursuant to Ind.Code § 34–24–3–1.[9]

On August 11, 2003, Rose and Underwood filed an objection to Mercantile's February 14, 2003, motion for leave to amend the complaint and requested a hearing. Mercantile filed a motion to strike Rose and Underwood's objection to the motion for leave to amend the complaint. On November 7, 2003, Rose and Underwood filed their answer to the amended complaint and demanded a jury trial. On November 26, 2003, the trial court granted Mercantile's motion to amend the complaint in a *nunc pro tunc* entry it dated March 28, 2003.[10] The trial court also reset the hearing on Mercantile's claim for treble damages, costs, fees, expenses and attorney fees for December 9, 2003.

On December 4, 2003, Rose and Underwood filed a motion to continue/vacate bench trial and request for additional time to object to the August 25, 2003 proposed order allowing the amendment of Mercantile's complaint. The motion also requested the trial court vacate the bench trial set for December 9, 2003, set the matter for a status conference, and then set the issue for trial by jury. On December 7, 2003, Mercantile filed a motion to strike Rose and Underwood's jury demand.

On December 19, 2003, the trial court entered its order, setting the first two counts of Mercantile's amended complaint as related to Jasper, Rose and Underwood for a bench trial on March 9, 2004 and tentatively setting Count III for a jury trial on June 8, 2004.[11]

---

9. In that same order, the trial court denied Mercantile's request for summary judgment against Utilities, Inc. and WSCI, concluding:

 2. By participating in the transfer of property with intent to defraud its creditor, [Jasper] has violated Ind.Code § 35–43–5–4(8). There remains genuine issues of material fact whether or not WSCI and Utilities, Inc. knowingly aided and abetted in [Jasper]'s fraud and in so doing committed a violation of Ind.Code § 35–43–5–4(8). Ind.Code § 35–41–2–4.

(Appellants' App. at 120.) At some point thereafter, Mercantile's claims against Utilities, Inc. and WSCI were dismissed.

10. The trial court's order indicates it selected that date because it was the first date, after Mercantile's motion to amend was filed, on which Rose and Underwood tendered another filing to the court, and they did not object to Mercantile's motion to amend at or before that time.

11. As the trial court had granted summary judgment on these issues in its order of June 24, 2003, we are uncertain why the parties and the court set the cause for a trial, whether bench or jury.

On March 24, 2004, the court determined Rose and Underwood were not entitled to a jury trial and vacated the jury trial set for June 8, 2004. That same day it heard evidence regarding all three counts of Mercantile's claim against Rose, Underwood, and Jasper. On April 20, 2004, the court entered findings of fact, conclusions of law and judgment against Rose and Underwood.

In its order, the court incorporated its findings of fact and conclusions of law from the July 24, 2003 summary judgment order, specifically finding:

> The Court made the following Findings of Fact based on summary judgment designations made by the parties. The Court now finds that these Findings of Fact were in every respect confirmed by the evidence presented at the trial of this matter on March 24, 2004 and the uncontroverted affidavits and evidence submitted on summary judgment.

(*Id.* at 16.) The court also entered an additional thirty-three findings of fact, based on the trial evidence, related to such topics as Rose and Underwood's "*Sale of the Company and Receipt of the Proceeds,*" (*id.* at 21), their "*Unjustified Refusal to Pay the Judgment,*" (*id.* at 23), their "*Bad Faith,*" (*id.* at 24), and their "*Economic Motivation to Ignore the Judgment.*" (*Id.*) The court also specifically noted: "The Court finds that [the summary judgment] Conclusions of Law were in every respect confirmed by the evidence presented at the trial of this matter on March 24, 2004." (*Id.* at 27.) After setting out the conclusions from the summary judgment order, the court added conclusions regarding damages and attorney fees. Pursuant to Ind.Code § 34-24-3-1, the court awarded Mercantile treble damages in the amount of $542,435.49 for Rose and Underwood's violation of Ind.Code § 35-43-5-4(8) and attorney fees in the amount of $162,730.00.

## DISCUSSION AND DECISION

### 1. *Change of Venue*

Rose and Underwood assert the trial court committed reversible error when it denied their motion for change of venue from the judge. Ind. Trial Rule 76(B) provides:

> In civil actions, where a change may be taken from the judge, such change shall be granted upon the filing of an unverified application or motion without specifically stating the ground therefore by a party or his attorney. Provided, however, a party shall be entitled to only one [1] change from the judge.

According to the plain language of that rule, Rose and Underwood were entitled to a change of judge unless they had previously received a change of judge in this cause of action. Therefore, we must determine whether the trial court had previously granted a change of judge to Rose and Underwood in this cause.

Proceedings supplemental are but a continuation of the original proceedings, with the result that changes of judge or venue are not available. *Jackson v. Russell,* 533 N.E.2d 153, 157 (Ind.Ct.App. 1989), *reh'g denied, trans. denied, cert. denied* 494 U.S. 1004, 110 S.Ct. 1297, 108 L.Ed.2d 474 (1990). This is so because "proceedings supplemental are not independent actions asserting new or different claims from the claim upon which the judgment was granted, but are merely proceedings to enforce that judgment." *Citizens Nat'l Bank of Grant County v. Harvey,* 167 Ind.App. 582, 590, 339 N.E.2d 604, 609 (1976). "As such, the validity of the underlying judgment has already been determined and proceedings supplemental may progress without a showing that execution has commenced or would be una-

vailing." *Borgman v. Aikens,* 681 N.E.2d 213, 217 (Ind.Ct.App.1997), *reh'g denied, trans. denied* 698 N.E.2d 1182 (Ind.1998).

Actions to set aside fraudulent conveyances are governed by Ind.Code ch. 32–18–2. A debtor's conveyance of property is fraudulent as to a creditor if the debtor made the transfer with actual intent to defraud the creditor, or without receiving a reasonably equivalent value in exchange for the transfer. Ind.Code § 32–18–2–14. The sole purpose of fraudulent conveyance actions is to remove obstacles that prevent the enforcement of judgments, and such actions are equitable executions comparable to proceedings supplemental. *Rice v. Comm'r, Indiana Dept. of Envtl. Mgmt.,* 782 N.E.2d 1000, 1004 (Ind.Ct.App.2003). "An action to set aside a fraudulent conveyance does not negate the disputed transaction; its only effect is to subject the conveyed property to execution 'as though it were still in the name of the grantor.'" *Id.* (internal citation omitted). Like proceedings supplemental, a fraudulent conveyance action is an equitable remedy designed to subject the debtor's property to execution by his creditor. *Id.*

Mercantile initiated proceedings supplemental against Jasper in March of 2002. In November of 2002, Mercantile filed its complaint for relief in aid of execution of judgment against Jasper and against Utilities, Inc., WSCI, Rose, and Underwood, as supplemental defendants. Mercantile asserted Jasper transferred its assets to Utilities, Inc. "with actual intent to hinder, delay and defraud [Mercantile] and the transfer therefore is fraudulent as to [Mercantile] ...." (Appellants' App. at 37). Mercantile also alleged Jasper deposited proceeds from the transfer into Jasper's bank account and then fraudulently transferred the monies to Rose and Underwood "with actual intent to hinder, delay and defraud [Mercantile] and the transfer is therefore fraudulent as to [Mercantile] ...." (*Id.* at 38). Mercantile requested the trial court void the transfers of the proceeds from the sale of Jasper to Rose and Underwood, enter an order permitting Mercantile to levy execution of the proceeds, and enter judgment against Rose and Underwood to the extent necessary to satisfy Mercantile's prior judgment against Jasper. Mercantile's complaint essentially was an action to set aside a fraudulent conveyance.

Like proceedings supplemental, the fraudulent conveyance action did not seek to determine whether Mercantile's claim should be satisfied, but rather how it should be satisfied. *See Illinois Founders Ins. Co. v. Horace Mann Ins. Co.,* 738 N.E.2d 705, 708 (Ind.Ct.App.2000) (stating that a motion for proceedings supplemental speaks only to how the claim is to be satisfied). Like proceedings supplemental, fraudulent conveyance actions are not separate from a plaintiff's judgment, but rather are extensions of a plaintiff's judgment. *See Giffin v. Edwards,* 711 N.E.2d 35, 37 (Ind.Ct.App.1999), *trans. denied* 726 N.E.2d 304 (Ind.1999). Accordingly, Mercantile's current claims are a continuation of the earlier cause of action by Mercantile against Jasper.

In the earlier proceedings in this cause, Jasper requested and received a change of venue from the judge. While Rose and Underwood were not named parties in the original action, "courts must look beyond the caption and nominal parties in determining the actual parties to a proceeding." *In re L.C.,* 659 N.E.2d 593, 598 (Ind.Ct.App.1995), *reh'g denied, trans. denied sub nom. Newman v. Worcester County Dept. of Soc. Serv.,* 683 N.E.2d 582 (Ind.1997), *cert. denied* 521 U.S. 1122, 117 S.Ct. 2515, 138 L.Ed.2d 1017 (1997).

"While, in a larger legal sense, the term 'party' or 'parties' has been defined as any or all persons who have a right to control the proceedings, to make defense, to adduce and cross-examine witnesses, and to appeal from the decision, if an appeal lies, the term 'party or parties to the action' is generally used to designate the person or persons who are seeking to establish a right and a person or persons on whom it is sought to impose a corresponding duty or liability, and the term 'party to a proceeding' in its ordinary legal meaning is held to embrace such persons only as are parties in a legal sense, and to have been made or become such in some mode prescribed or recognized by the law, so that they are bound by the proceeding.

Whether a person is a party to an action must be ascertained exclusively by an inspection of the record. It can appear in no other way."

*Id.* (quoting *Hepp v. Hammer*, 445 N.E.2d 579, 581 (Ind.Ct.App.1983)). Because Rose and Underwood, as the two owners of Jasper, had "a right to control the proceedings, to make defense, to adduce and cross-examine witnesses, and to appeal from the decision," *Id.*, they were in essence parties to the original proceedings by Mercantile against Jasper.

Mercantile's fraudulent conveyance action is an extension of the original proceeding. In the original proceeding, Rose and Underwood, as the two owners of Jasper, had the ability to control those proceedings on behalf of Jasper, and they requested a change of judge. Because Rose and Underwood had already received one change of judge in this proceeding, we cannot say the trial court erred when it

denied Rose and Underwood's second motion for change of judge in the same proceeding.[12] *See, e.g., Jackson,* 533 N.E.2d at 157 (finding change of judge unavailable in continuation of original proceeding).

### 2. *Amendment of Complaint*

On February 14, 2003, the day after Mercantile filed its Motion for Summary Judgment, Mercantile filed a motion for leave to amend its complaint to add a third count, seeking treble damages and attorney fees pursuant to Ind.Code § 34–24–3–1.

In Mercantile's April 7, 2003 reply to Rose and Underwood's response to Mercantile's motion for summary judgment, Mercantile argued it "was entitled to treble damages, costs, attorneys' fees, travel and other expenses, pursuant to Ind.Code § 34–24–3–1 for the pecuniary loss suffered as a result of [Rose and Underwood's] violation of Ind.Code § 35–43–5–4." (Appellant's App. at 110.)

At the July 8, 2003 hearing on the motion for summary judgment, Mercantile argued:

We're asking that the court enter summary judgment against each and all of [the defendants] for violation of the Indiana Fraudulent Transfer Act. We're asking for treble damages. If the court feels at this point that it does not want to enter damages and hold that matter for hearing, we are asking that it make a finding as to liability and set this matter for a later hearing as to the damages, attorney fees and other costs that arise out of it.

(Tr. at 18.) Rose and Underwood did not object to that argument.

12. Because we dispose of Rose and Underwood's motion for change of judge under Trial Rule 76(B), we need not determine whether their motion was timely under Trial Rule 76(C). Our failure to address that issue should not be construed to imply the motion was timely.

On July 24, 2003, the trial court entered conclusions of law granting summary judgment to Mercantile in which it also provided:

> 11. It is within this Court's discretion to determine the amount of damages that should be awarded when an action is brought by crime victim under treble damages statutes. *Ballard v. Harman*, 737 N.E.2d 411 (Ind.Ct.App. 2000)[, *reh'g denied*]. The Court sets the Plaintiff's request for treble damages for further hearing and consideration on August 25, 2003 at 10:30 A.M.
>
> 12. Plaintiffs are also entitled to recover their costs, attorneys' fees, travel and other expenses, pursuant to Ind. Code § 34–24–3–1 for the pecuniary loss suffered as a result of Defendants' violation of Ind.Code § 35–43–5–4. The award of attorneys' fees is mandatory under Ind.Code § 34–24–3–1. *Patricia Ann Brown, C.P.A. v. Brown*, 776 N.E.2d 394 (Ind.Ct.App.2002)[, *trans. denied* 792 N.E.2d 36 (Ind.2003) ].

(Appellant's App. at 119.)

On August 11, 2003, Rose and Underwood filed an objection to Mercantile's February 14, 2003, motion for leave to amend the complaint. Mercantile filed a motion to strike that objection. On November 7, 2003, Rose and Underwood filed their answer to the amended complaint. On November 26, 2003, the trial court granted Mercantile's motion to amend the complaint pursuant to Trial Rule 15(B),[13] noting Rose and Underwood had failed to object to Mercantile's motion within twenty days, as required by Trial Rule 6(C), or to request an extension of time to respond.

Rose and Underwood contend the trial court abused its discretion in allowing Mercantile to amend its complaint. We disagree.

 Trial courts have broad discretion to grant or deny a motion to amend a complaint, and we reverse its decision only for an abuse of that discretion. *Crawford v. City of Muncie*, 655 N.E.2d 614, 622 (Ind.Ct.App.1995), *reh'g denied, trans. denied*. An abuse of discretion has occurred if the court's conclusion or judgment is clearly against logic in light of the facts and inferences available to the court. *Strodtman v. Integrity Builders, Inc.*, 668 N.E.2d 279, 284 (Ind.Ct.App.1996), *trans. denied* 683 N.E.2d 585 (Ind.1997).

Mercantile filed a motion to amend pursuant to Ind. Trial Rule 15(A), which provides:

> A party may amend his pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted, and the action has not been placed upon the trial calendar, he may so amend it at any time within thirty [30] days after it is served. Otherwise a party may amend his pleading only by leave of court or by written

---

**13.** Ind. T.R. 15(B) provides:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all aspects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment, but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

consent of the adverse party; and leave shall be given when justice so requires. A party shall plead in response to an amended pleading within the time remaining for response to the original pleading or within twenty [20] days after service of the amended pleading, whichever period may be the longer, unless the court otherwise orders.

Because more than thirty days had passed since the filing of Mercantile's original complaint and because Rose and Underwood answered Mercantile's original complaint three days before Mercantile moved to amend its complaint, Mercantile was no longer permitted to amend its pleading "as a matter of course." T.R. 15(A). Rather, it was required to receive consent from Rose and Underwood or leave of court. *Id.*

■■■■■■ Trial courts should liberally permit amendments to pleadings. *Strodtman,* 668 N.E.2d at 284. To make its decision, a court should consider " 'undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiency by amendment previously allowed, undue prejudice to the opposing

party by virtue of the amendment, and futility of the amendment.' " *Crawford,* 655 N.E.2d at 622–23 (quoting *Palacios v. Kline,* 566 N.E.2d 573, 575 (Ind.Ct.App. 1991)). Rose and Underwood have not argued on appeal that any of the factors the court should have considered prior to granting the amendment weighed in their favor.

■■■■■■ Nor have Rose and Underwood asserted they were not served with the motion to amend the complaint, which was filed on February 14, 2003. Nevertheless, they did not file an objection to the amendment by pleading or at a hearing until August 11, 2003. When a party fails to object to the filing of an amended complaint, the party invites any error that occurs when the court permits the amendment because any alleged error is "the natural consequence of [the party's] neglect." *Kirtley v. McClelland,* 562 N.E.2d 27, 31 (Ind.Ct.App.1990), *reh'g denied, trans. denied.* Accordingly, the trial court's grant of Mercantile's motion to amend was not an abuse of discretion under T.R. 15(A).[14]

---

14. The dissent would hold parties should not be permitted to assert a claim under Ind.Code § 34–24–3–1 within a proceedings supplemental or a fraudulent conveyance action, because to do so would permit a party to bring a new civil action in a proceeding that is intended only to assist a party in recovering money to which it is already entitled.

We note Rose and Underwood did not raise this argument on appeal, and accordingly, it is waived. Nor did they assert such an argument in their trial court motion objecting to the proposed amendment, so the issue is also waived for failure to present the argument to the trial court.

Waiver notwithstanding, if Mercantile is prohibited from asserting its claim under Ind. Code § 34–24–3–1 in this proceeding supplemental, the claim will forever be barred by *res judicata. Res judicata* is the "affirmative defense barring the same parties from litigating a second lawsuit on the same claim, or any

other claim arising from the same transaction or series of transactions that could have been—but was not—raised in the first suit." Black's Law Dictionary at 1312 (7th ed.1999). Here, the same transactions and parties are involved in the request for relief under the Uniform Fraudulent Transfer Act and under the statute providing compensation for crime victims. If for no other reason than judicial economy, Mercantile should be able to assert the second claim herein.

Nor are we convinced the Uniform Fraudulent Transfer Act requires the conclusion reached by the dissent. For example, while .Ind.Code § 32–18–2–17(a)(1) permits a creditor to obtain avoidance of a transfer "to the extent necessary to satisfy the creditor's claim," subsection (a)(3)(C) permits a creditor to obtain "[a]ny other relief the circumstances require" "[s]ubject to applicable principles of equity and in accordance with applicable rules of civil procedure." The Seventh Cir-

▮ In addition, Mercantile's right to recover treble damages was argued at the summary judgment hearing with Rose and Underwood's implied consent. In its summary judgment reply brief, Mercantile asserted it was entitled to summary judgment on its treble damages claim under Ind.Code § 34-24-3-1. At the summary judgment hearing, Mercantile argued for damages under the treble damages statute. Rose and Underwood did not object to Mercantile's argument. The trial court's Conclusions of Law demonstrate the trial court believed the issue of Mercantile's recovery of treble damages was before it.

▮ Trial Rule 15(B) permits a trial court to allow amendments to the pleadings to conform to the evidence presented at trial. Before a party may impliedly consent to the trial of an issue, he or she must receive some notice of that issue. *Curtis v. Clem,* 689 N.E.2d 1261, 1264 (Ind.Ct.App.1997). The rationale behind T.R. 15(B) is to promote relief for a party based upon the evidence actually forthcoming at trial, notwithstanding the initial direction set forth by the pleading. *Id.* Rose and Underwood did not object at the summary judgment hearing to Mercantile's argument regarding recovery of treble damages. As a result, the trial court did not err in granting the motion to amend under Trial Rule 15(B).[15]

### 3. *Denial of Jury Trial*

Rose and Underwood argue the trial court erred by denying their request for a jury trial on the treble damages issue. On December 9, 2003, the trial court held a hearing during which Rose and Underwood's request for a jury trial was argued. On December 19, 2003, the trial court issued an order which "preserve[d] the issue of the Defendants jury demand as to Count III of the Amended Complaint for Relief and tentatively sets Count III as it

---

cuit has noted that "catchall provision ... would seemingly empower a court to provide monetary relief at its discretion," *DFS Secured Healthcare Receivables Trust v. Caregivers Great Lakes, Inc.,* 384 F.3d 338, 353 (7th Cir.2004), and that "a straightforward reading of the [Act's] catchall provision would seemingly allow for punitive damages." *Id.* at 354. Because other jurisdictions that have adopted the Uniform Act are split on whether such damages are permitted under the Act, the Seventh Circuit certified those questions to the Indiana Supreme Court, which accepted the certified questions on October 14, 2004. However, the parties settled the case, and the Seventh Circuit dismissed it. Therefore, the Indiana Supreme Court did not provide an answer. *DFS Secured Healthcare Receivables Trust v. Caregivers Great Lakes, Inc.,* No. 94S00-0410-CQ-447 (Ind. Feb.24, 2005) (cause dismissed).

As for the dissent's assertion that a claim under Ind.Code § 34-24-3-1 is inappropriate in a proceeding supplemental because it is a request for a "new judgment," we note that an action under the Uniform Fraudulent Transfer Act is also a separate cause of action.

*See* Ind.Code § 32-18-2-17(a) ("[i]n an action for relief ... under this chapter ....."). We permit parties to bring IUFTA causes of action in the context of a proceeding supplemental, and no argument for distinguishing the crime victim's compensation statute has been raised.

**15.** We acknowledge Trial Rule 15(B) refers to amending the pleadings to conform "to the evidence ... at the trial" and the proceeding at issue herein was a hearing on summary judgment. However, we believe the policies underlying liberal amendment of the pleadings permit us to apply Rule 15(B) in the summary judgment context because Rose and Underwood failed to object at the summary judgment hearing to Mercantile's argument regarding treble damages.

Moreover, Rose and Underwood acknowledge any alleged error might have been harmless: "Prior to the entry of November 26 2003 discussed herein, ROSE and UNDERWOOD filed an answer and later the court held a trial in which they participated, which may make this issue one of harmless error." (Appellants' Br. at 18.)

pertains to Defendants, Rose, Underwood ... for a two day trial with intervention of jury commencing June 8, 2003 at 9:00 A.M." (Appellant's App. at 163.) The Court extended the discovery deadline and ordered counsel to complete discovery by February 15, 2004.

At the trial on March 24, 2004, the trial court stated "it seemed to me we never resolved the issue of whether or not there was a jury trial. I didn't guarantee a jury trial. Seemed to me something was going to be resolved today, and we're trying to figure out what that was." (Tr. at 89.) Rose and Underwood argued Mercantile's entitlement to treble damages was not scheduled for that day; instead, it would be heard later with a jury. The trial court stated: "That is wrong. That is wrong. I remember at the time we had every indication of presenting evidence today.... I remember it very well. Very well. So at this point the Court will enter an order denying the right to a jury trial on Count 3. Okay, you may proceed." (Id. at 92–93.)

■ At that point, Rose and Underwood did not ask for a continuance. Rather, they continued with the trial, including the issue of treble damages. Because Rose and Underwood did not ask for a continuance, they cannot now complain they were unprepared to try that issue on March 24. See, e.g., Kirtley, 562 N.E.2d at 32 (failure to request continuance to prepare for presentation of evidence regarding unexpected issue results in waiver of any error in addressing the issue).

■ Moreover, the trial court had already determined Mercantile's entitlement to treble damages in its summary judgment order of July 24, 2003. The only remaining fact to be determined was the amount of that treble damage award. Because Rose and Underwood failed to request a jury trial as to Count III of the amended complaint before they allowed that issue to be tried by implied consent at the summary judgment hearing, they waived the opportunity to assert any right to a trial by jury.

4. *Uniform Fraudulent Transfer Act*

Rose and Underwood assert the trial court erred in finding they violated the Uniform Fraudulent Transfer Act. We disagree.

■ Jasper, Rose, and Underwood requested specific findings of fact and conclusions of law. When a party has requested specific findings of fact and conclusions of law pursuant to Indiana Trial Rule 52(A), we may affirm the judgment on any legal theory supported by the findings. *Wenzel v. Hopper & Galliher, P.C.,* 779 N.E.2d 30, 36 (Ind.Ct.App.2002), *trans. denied* 792 N.E.2d 43 (Ind.2003). In reviewing the judgment, we first must determine whether the evidence supports the findings, and second, whether the findings support the judgment. *Id.* Findings of fact are clearly erroneous when the record lacks any evidence or reasonable inferences from the evidence to support them. *Id.* The judgment will be reversed if it is clearly erroneous. *Id.* To determine whether the findings or judgment are clearly erroneous, we consider only the evidence favorable to the judgment and all reasonable inferences flowing therefrom. *Id.* We will not reweigh the evidence or assess witness credibility. *Id.* Even though there is evidence to support it, a judgment is clearly erroneous if our examination of the record leaves us with a firm conviction that a mistake has been made. *Id.*

■ Rose and Underwood contend the trial court erred when it found they violated Indiana's Fraudulent Transfer Act, Ind.Code ch. 32–18–2. Specifically, Rose and Underwood assert the evidence

does not support a finding of fraudulent intent.

However, the trial court specifically concluded in relevant part:

8. As a matter of law, the payment of the sales proceeds to Rose and Underwood, without a corresponding transfer of equivalent value from them, was a fraudulent transfer under [Ind.Code § ] 32–18–2–14(2), which does not require a showing of fraudulent intent. A fraudulent transfer is conclusively established because the transfer was made without giving [Jasper] 'a reasonable equivalent value in exchange for the transfer' and [Jasper]: (A) was engaged in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; and (B) intended to incur or believed or reasonably should have believed that it would incur debts beyond its ability to pay as the debts became due.

(Appellants' App. at 29) (emphasis in original).

The statute on which the trial court relied provides:

A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer· was made or the obligation was incurred if the debtor made the transfer or incurred the obligation:

\* \* \* \* \* \*

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(B) intended to incur or believed or reasonably should have believed that the debtor would incur debts beyond the debtor's ability to pay as the debts became due.

Ind.Code § 32–18–2–14(2). Our reading of that subsection leads us to the same conclusion the trial court reached: if a plaintiff can demonstrate the elements in the statute were satisfied, no separate showing regarding the defendant's intent is required.[16]

---

**16.** Whether there is fraudulent intent is a question of fact, *Greenfield v. Arden Seven Penn Partners, L.P.*, 757· N.E.2d 699, 703 (Ind. Ct.App.2001), *reh'g denied, trans. denied* 774 N.E.2d 515 (Ind.2002), and may be inferred from various factors or "badges of fraud" present in a transaction. *Id.* No single badge constitutes a showing of fraudulent intent per se. *Id.* Thus, the facts must be taken together to determine how many badges of fraud exist and whether, if taken together, they amount to a pattern of fraudulent intent. *Id.* at 703–04.

Here, the trial court found several badges of fraud: (1) the sale of Jasper and its assets during the pendency of a suit; (2) the sale leaving Jasper insolvent or greatly reducing its assets; (3) a series of contemporaneous transactions that stripped Jasper of all property available for execution; (4) a secret or hurried transaction not in the usual mode of doing business; and (5) a transaction conducted in a manner differing from customary methods. Rose and Underwood do not dispute the presence of the first two badges of fraud. They maintain, however, the evidence is insufficient to support a finding of the last three badges of fraud.

A. *Series of contemporaneous transactions*
A series of contemporaneous transactions, the result of which strips the debtor of its property available for execution, is not an ordinary transaction, and therefore, is a badge of fraud. *Arnold v. Dirrim*, 398 N.E.2d 442, 447 (Ind.Ct.App.1979). In this case, Mercantile filed a cause of action against Jasper in December of 1995, which was tried before the bench on May 21, 1999. On November 15, 2001, the trial court entered judgment against Jasper in the amount of

■ These findings support the conclusion Rose and Underwood violated that subsection:

19. On November 15, 2001, this Court entered its findings of fact and conclusions of law and judgment in favor of the Plaintiffs and against [Jasper] in this cause in the amount of $159,581.00, upon which no amounts had been paid as of July 21, 2003.

\* \* \* \* \* \*

21. On December 17, 2001, [Jasper] filed its motion to correct errors and set aside the judgment and damages awarded to the Plaintiffs.

\* \* \* \* \* \*

23. WSCI and [Jasper] did not close on the purchase until December 18, 2001, thirty three (33) days after judgment, with full knowledge that judgment had been rendered against [Jasper] on November 15, 2001.

$159,581.00. Jasper and WSCI closed on the sale of Jasper's assets on December 18, 2001, and the $470,000.00 from the sale were deposited into Jasper's account. Within three days, Rose wrote two checks on Jasper's account, one payable to Rose and one payable to Underwood, in the amount of $235,000.00 each. Given these facts, the trial court could find a succession of transactions that effectively deprived Jasper of assets from which Mercantile's claims could have been satisfied.

B. *Secret or hurried transactions not in the usual mode of business*

Jasper received its proceeds from the sale on or about December 18, 2001. On or about December 20, 2001, Rose wrote two checks payable to Underwood and himself against Jasper's bank account in the amount of $235,000.00 each. Instead of escrowing the funds, Rose and Underwood proceeded to deposit the funds in their personal bank accounts. The transfer of funds from Jasper to Rose and Underwood was hurried.

Additionally, the distribution was not in the usual mode of business. Pursuant to Ind. Code § 23-1-28-3, a distribution may not be

24. On December 21, 2001, the Court denied [Jasper's] motion to correct errors.

25. After closing the sale and transfer of assets, the revenues received by [Jasper] as a Sub-Chapter "S" Corporation were distributed in equal amounts by [Jasper] to Rose and Underwood without receiving any "value" from Rose and Underwood in exchange.

26. On January 18, 2002, [Jasper] filed its notice of appeal of the $159,581 judgment that had been entered against [Jasper] in favor of the Plaintiffs.

27. Rose and Underwood have acknowledged they are the sole shareholders of [Jasper].

\* \* \* \* \* \*

30. [Jasper], Rose, and Underwood took precautions to evade the obligations to "known creditors," including Plaintiffs.

\* \* \* \* \* \*

made if it would render a corporation unable to pay its debts as they become due in the usual course of business or would result in the corporation's assets being less than the sum of its total liabilities. Here, with knowledge of Jasper's judgment liability to Mercantile, Rose depleted all of Jasper's assets and "closed" the business. We cannot say the trial court erred in finding this badge of fraud.

C. *Transaction in a manner differing from customary methods*

As noted above, Rose and Underwood depleted the assets from Jasper and allegedly closed the business with full knowledge of Mercantile's judgment against Jasper. We cannot say this is a "customary method" of business.

Thus, the evidence supports the trial court's finding Rose and Underwood's actions displayed five badges of fraud, which would support the finding of fraudulent intent necessary to find Rose and Underwood in violation of other portions of the Uniform Fraudulent Transfer Act.

42. [Jasper] received a check for approximately $470,000 at the time of closing on or about December 18, 2001 and Rose deposited it in Kentland Bank.

43. Rose wrote checks against that amount within a few days after it was deposited to Robert Underwood and James Rose for $235,000 each.

(Appellants' App. at 19–22.) Rose and Underwood do not challenge the validity of those findings.

Nevertheless, Rose and Underwood claim Jasper could not have violated that subsection by distributing assets to them because: "[Jasper] was not engaged in any transaction; the funds left [Jasper] through a distribution to stockholders. [Jasper] was no longer in business and was not incurring debts." (Appellant's Br. at 31.) When Jasper distributed its remaining assets to Rose and Underwood, on December 20 or 21, 2001, it knew the trial court had entered a $159,581.00 judgment in favor of Mercantile and against it on November 15, 2001. As Jasper knew it had that outstanding judgment against it, we find misplaced Rose and Underwood's claim Jasper "was not incurring debts." The distribution to Rose and Underwood was a transaction that left Jasper without the assets it needed to pay a known debt. We cannot find clearly erroneous the court's conclusion that Jasper, Rose, and Underwood violated Section 14 of Indiana's Uniform Fraudulent Transfer Act.

### 5. Treble Damages

■ Rose and Underwood assert the trial court erred when it found Mercantile was entitled to recover treble damages and attorney's fees pursuant to Ind.Code § 34–24–3–1. Specifically, Rose and Underwood argue "there is insufficient evidence to establish that the transfer was made with 'the intent to defraud.'" (Appellants' Br. at 35.) We disagree.

Ind.Code § 34–24–3–1 provides:

If a person suffers a pecuniary loss as a result of a violation of IC 35–43 ... the person may bring a civil action against the person who caused the loss for the following:

(1) An amount not to exceed three (3) times the actual damages of the person suffering the loss.

(2) The costs of the action.

(3) A reasonable attorney's fee.

Thus, to qualify for these remedies, Mercantile had to demonstrate it suffered a pecuniary loss as a result of a violation of Ind.Code Art. 35–43.

■ Ind.Code § 35–43–5–4(8) provides that a person who "with intent to defraud the person's creditor or purchaser, conceals, encumbers, or transfers property" commits fraud, a class D felony. All elements of the alleged fraud, including the requisite criminal intent, must have been proven by Mercantile by a preponderance of the evidence. See Palmer Dodge, Inc. v. Long, 791 N.E.2d 788, 791 (Ind.Ct.App. 2003) (victim seeking relief for damages arising out of criminal conversion must prove by a preponderance of the evidence all elements of the alleged criminal conversion, including the requisite criminal intent).

The trial court concluded: "Rose and Underwood intentionally transferred the assets of [Jasper] to themselves personally with intent to defraud [Jasper's] creditors in violation of [Indiana Code § ] 35–43–5–4(8) ...." (Appellants' App. at 30.) The trial court made the following findings that support that conclusion:

*Sale of the Company and Receipt of Proceeds*

36. Rose and Underwood contracted to sell the business on January 12, 2001, to

an entity called WSCI or Indiana Utilities, Inc. The closing occurred on or about December 18, 2001. Rose and Underwood liquidated the company, received proceeds from the sale, depleted the assets, closed the business, filed a tax return, and dispersed the money to themselves, the sole stockholders.

37. At the time the sales transaction closed on December 18, 2001, all parties to that transaction knew that the judgment had been entered, yet no provision was made to pay for the judgment at the time of closing.

38. Rose and Underwood intended to avoid the judgment owed Plaintiffs, indicating at trial:

"[W]e was looking at liquidating the company and filing a tax return. We had to put the money somewhere and the only place you could put it was to disperse it to the partner, stockholders."

39. At trial, it was clear that Rose and Underwood intentionally depleted [Jasper's] assets to avoid paying [Mercantile's] judgment:

"[D]id I redeposit [the sales proceeds] back into the company? ... No, we closed the company. We can't have assets in the company. We were selling it and closing the company out. And they— [the purchasers] only bought the assets, not the liabilities."

40. Rose and Underwood consulted with their attorney to devise a plan to protect [WSCI] and nonetheless avoid paying [Mercantile's] judgment. They hired a law firm to manage the sale and a separate law firm to petition the IURC for approval, both of whom required 'a hold harmless agreement in place to protect the buyer.' Among Rose, Underwood, their attorneys and auditors, "it was all agreed on how [they] would, with the auditor, close the company, handle the proceeds, and handle the judgment, and handle the hold harmless with the buyer."

41. At the time of the closing, [Jasper's] accountant or bookkeeper discussed it with their tax preparer. Rose discussed the judgment with his attorney and the company's auditor, and it was agreed how they would handle the proceeds, and handle the judgment, and handle the hold harmless agreement with the buyer. Nothing prevented Rose and Underwood from paying the taxes and leaving the $160,000 in the account for the corporation to pay the judgment.

42. [Jasper] received a check for approximately $470,000 at the time of closing on or about December 18, 2001 and Rose deposited it in Kentland Bank.

43. Rose wrote checks against that amount within a few days after it was deposited to Robert Underwood and James Rose for $235,000 each. Funds from the sale of the assets of [Jasper] were placed into Rose's and Underwood's personal account and reported on their taxes for 2001.

44. Underwood did not disclose to [Mercantile] that he was transferring the funds from [Jasper] to themselves.

*Indemnity Agreement*

45. At the time of the sale, Rose and Underwood informed the prospective purchasers that the judgment had been entered for $159,000. The purchasers would agree to the closing only if Rose and Underwood would hold them harmless.

46. Rose and Underwood entered into a hold harmless indemnification agreement with WSCI at the closing "[b]ecause the judgment came down 5 days

before.... [a]nd the purchaser wanted to be protected from the judgment."

*Unjustified Refusal to Pay the Judgment*

47. Shortly after November 15, 2001 and prior to closing, Rose and Underwood became aware that a judgment had been entered in this Court in the amount of $159,581 on behalf of the plaintiffs against [Jasper].

48. In November of 2002, Underwood learned that the fraudulent transfer complaint had been filed.

49. Underwood was advised in late February or early March of 2003 that the Indiana Court of Appeals had decided the appeal on the court's judgment of $159,000 against them.

50. [Jasper], Rose and Underwood did not pay the judgment when they learned the appeal had been decided against them, in February of 2003.

51. [Jasper], Rose and Underwood did not pay the judgment for another 5 months and "doesn't recall why they didn't pay it exactly at that time."

52. In early July of 2003, after it became apparent that the Court was inclined to grant summary judgment finding a fraudulent transfer, Underwood and Rose made arrangements to pay the judgment, plus all the interest. The funds were paid into court with cashier's check from the Kentland Bank. Rose and Underwood each paid half from their personal funds.

*Bad Faith Demonstrated in Settlement Offer*

53. When Underwood discovered in late February of 2003 that his appeal had been denied and knew the fraudulent transfer case was still pending, he authorized his attorney to write a letter, offering $30,000, *after* the appeal was over and he knew that [Jasper] owed [Mercantile] approximately $180,000, plus interest. Rose and Underwood, with combined income of exceeding $5,000,000 for 2001 and combined assets approaching $30,000,000, made an offer of $30,000 to settle a $180,000 judgment against it that had been affirmed on appeal....

54. When they made the offer to settle, Rose and Underwood had depleted all of the assets remaining with [Jasper], effectively giving them leverage against [Mercantile's] collection of the entire judgment outright. [Jasper's] only leverage to prevent [Mercantile] from collecting the full judgment was the fact that Rose and Underwood had depleted all of [Jasper's] assets through the fraudulent transfer.

\* \* \* \* \* \*

*Economic Motivation to Ignore the Judgment*

56. In response to a question regarding why they refused to pay the judgment, on which all appeals had been exhausted, Rose answered:

> "Personally, I don't believe that it was a right and fair judgment, and we were prepared to fight it, as far as we could. And we did so until it didn't make any more economic sense to do so."

57. Even at the trial, Underwood lamented:

> "We probably should've never paid the judgment unless [the fraudulent transfer claim] was dropped,"

again reflecting their inclination to use [Jasper's] insolvency as leverage to prevent [Mercantile] from collecting the judgment.

58. Rose and Underwood simply did not agree with the judgment and therefore decided to defy it until the cost became too great. They indicated that

they did not make arrangements to pay the judgment because they were

> "dumbfounded with the judgment that came down, and we felt that we were going to appeal it, and we felt that we would—we would win the appeal."

59. Even after all appeals had been exhausted, Rose and Underwood used [Jasper's] insolvency as leverage, refusing to pay because they

> "were trying to decide whether [they] could negotiate a settlement,"

which was only "negotiable" because they had depleted all of [Jasper's] assets.

(*Id.* at 21–25) (emphases in original) (citations omitted).

During the bench trial on March 24, 2004, Underwood testified that after Jasper received the check from the sale proceeds, "[w]e depleted the assets, closed the business, to file a final tax return at the end of the year, based on our auditor knowing we was [sic] closing the business and had sold it." (Tr. at 96.) Underwood was asked:

> Q: After you became aware in November of 2001 that a judgment had been entered against Jasper–Newton Utilities, did you shortly thereafter become aware of any type of an appeal that was filed on behalf of the utility regarding this judgment?
>
> A: Yes, we—we—Mr. Rose and I agreed we was [sic] going to appeal it. And so therefore we knew it was going to be appealed, so we was looking at liquidating the company and filing a tax return. We had to put the money somewhere, and the only place you could put

it was to disperse it to the partners, stockholders.

(*Id.* at 107.) [17]

Rose and Underwood argue they consulted an attorney, their auditor and an accountant regarding what to do with the proceeds of the sale. However, Underwood did not testify the auditor told them what to do; rather, he testified their auditor knew they were closing the business. When Underwood was asked whether he and Rose followed the advice of their attorney and their accountant, he testified: "Yeah, they discussed it between the two of them." (*Id.* at 113.) This testimony means merely that the accountant and the lawyer had talked about this issue; it does not demonstrate the lawyer or accountant advised him and Rose to deplete the assets when the judgment debt was outstanding.

Underwood also testified as follows:

Q: Why didn't you retain the assets? You said you had an obligation—I think you had a duty to meet the obligations of the company. You didn't treat the judgment as an obligation of the company?

A. I think we did, yes.

Q. Where did you pay the judgment off at the time of closing?

A. Well, why would we pay it off if we were going to appeal it?

Q. Because it was an obligation, wasn't it?

A. Not until it's appealed.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. Well, the appeal was concluded ... on February 12th of 2003, and I believe you paid the money to the clerk of the court, under circumstances that the Court's aware of, on July 23rd of 2003. That's almost half a year later. Why,

---

17. We note the portion of the proceeds that would pay the judgment presumably could have been put in an escrow account and dispersed when necessary.

when the appeal was concluded, did you not pay the judgment?

A. You don't ever pay a judgment if you're going to appeal it.

Q. No, the appeal was over. The appeal was concluded on February 12th of '03, and the Court of Appeals ruled against you, and the judgment was affirmed. Why did you not pay the judgment in February of 2003.

A. We probably should've never paid the judgment unless this was dropped.

Q. I'm sorry, what, sir?

A. We probably should've never paid the judgment without dropping this other issue.

\* \* \* \* \* \*

Q. (by the Court) When the decision was rendered against you on appeal, the question is, apparently you were going to hold harmless, why didn't you come in and pay off the judgment, for another 5 months?

A. I don't recall why we didn't pay it exactly at that time, Judge.

(*Id.* at 115–16.)

Q. (by the Court) So you made a good faith offer of $30,000 to settle $180,000 litigation? At that point you had a $180,000 judgment against you, that had been affirmed on appeal. And then you offered $30,000 in good faith to settle it, is that your intent there?

A. Evidently, it's—we must've. I mean, you know, I have some judgments out right now, I'd love to settle for very little money.

(*Id.* at 123.) With respect to the initial settlement offer of $30,000.00, Rose testified that "[y]ou've got to start somewhere. Snapped it out of the air." (*Id.* at 129.)

Rose and Underwood had the financial wherewithal to pay the judgment once the appeal was concluded. Rose testified that,

as of March 31, 2003, his net worth was $9,819,315.00.

Rose and Underwood assert "there is no evidence to establish the intent to defraud as required under the criminal statutes." (Appellants' Br. at 38.) We disagree. The evidence discussed above, including the late low-ball settlement offer, the badges of fraud, and the numerous findings by the trial court, could lead a reasonable person to conclude by a preponderance of the evidence Rose and Underwood's motive in transferring the monies out of Jasper was to withhold it from Mercantile. We cannot find clearly erroneous the trial court's conclusion "Rose and Underwood intentionally transferred the assets of [Jasper] to themselves personally with intent to defraud [Jasper's] creditors in violation of Ind. Code § 35–43–5–4(8)." (Appellants' App. at 30.)

### 6. *Attorney's Fees*

■ Finally, Rose and Underwood challenge the amount of the trial court's award of attorney's fees to Mercantile. Because an award of attorney's fees is mandatory when a plaintiff prevails under Ind.Code § 34–24–3–1, *Brown,* 776 N.E.2d at 397, we review only the amount of that award.

■■ A trial court has broad discretion to determine the amount of attorney's fees awarded. *Id.* We review its decision for an abuse of discretion, and reverse "only when the trial court's award is clearly against the logic and effect of the facts and circumstances before the court." *Id.*

■ The trial court determined a reasonable attorney's fee would be 30% of the recovery, or $162,730.00. As we have explained:

A contingent fee agreement in a collection case that is the product of a bargain between the attorney and client is pre-

sumed to be reasonable as between them. *See Waxman Indus v. Trustco Dev. Co.*, 455 N.E.2d 376, 380 (Ind.Ct. App.1983) (contingent fee contract generally is binding between attorney and client). Where such a fee is subtracted from the amount recovered, the third-party debtor is unaffected by the fee agreement. However, it is an entirely different matter when the fee is added to the judgment against the debtor. In that instance the debtor has a direct pecuniary interest in how the fee is determined. Thus, a one-third contingent fee that is reasonable when deducted from a client's recovery may be unreasonable when added to a debtor's judgment.

Our court has recognized that contingent fee agreements will not be implied in law even when a contracting party had agreed to pay reasonable attorney's fees upon default. *See Berkemeier v. Rushville Nat'l Bank*, 459 N.E.2d 1194 (Ind.Ct.App.1984) (note and mortgage contract); *accord Leibowitz v. Moore*, 436 N.E.2d 899 (Ind.Ct.App.1982), *appeal after remand*, 477 N.E.2d 946 (Ind. Ct.App.1985), *modified*, 480 N.E.2d 607 (Ind.Ct.App.1985) (promissory note); *Waxman Indus.*, 455 N.E.2d 376 (lease agreement); *Lake County Trust Co. v. Gainer Bank N.A.*, 555 N.E.2d 1356 (Ind.Ct.App.1990) (real estate purchase agreement), *trans. denied.* In *Waxman Industries*, we reasoned:

> [A] contingent fee, even between an attorney and his client, is not enforceable unless it is founded upon a prior agreement. It then follows inexorably that a contingent fee contract of the obligee on an instrument with his attorney cannot be enforced against the party obligor who has merely agreed in the instrument to pay a "reasonable attorney fee" for the fundamental reason that the obligor has never agreed

or has never even been consulted concerning the arrangement.

*Waxman Indus.*, 455 N.E.2d at 381. Thus, without other objective evidence of reasonableness, a contingent fee cannot be added to a judgment against a third party.

In considering the reasonableness of an attorney's fee, it makes no difference whether the obligation to pay the fee is based on a statutory provision or on a prior agreement. Here, the court concluded that "[a] one-third (1/3) contingent fee is a standard and customary fee in the collection practice of law." While that conclusion may well be true as a general matter, it cannot in itself support the contingent fee awarded in this case where the fee was added to the judgment against a third party.

*Valparaiso Technical Inst., Inc. v. Porter County Treasurer*, 676 N.E.2d 416, 420–21 (Ind.Ct.App.1997), *reh'g denied* 682 N.E.2d 819 (Ind.Ct.App.1997). The trial court based its decision to award 30% of the recovery on the fact that attorney fee awards in similar cases based on tort litigation would be 30 to 40% of the total recovery. Accordingly, the fee determined by reference to a typical contingency fee and imposed herein was an abuse of discretion unless it was objectively reasonable.

 Mercantile's counsel testified that, with the exception of his time spent at the trial, Mercantile had been billed $60,346.52 in attorneys fees. The trial court's award results in Rose and Underwood paying nearly three times the amount Mercantile had been billed. While a "trial court is not required to award exactly what the litigant says her attorneys' fees are in a case," *Brown*, 776 N.E.2d at 398, we believe the court's award of $162,730.00 in this case is unreasonable. Because the trial court

abused its discretion, we reverse and remand for the court to calculate reasonable attorney's fees.

## CONCLUSION

The trial court did not abuse its discretion when it denied Rose and Underwood's motion for change of venue from the judge, when it granted Mercantile's motion to amend its complaint, or when it denied Rose and Underwood's motion for a jury trial on the treble damages count. The evidence supports the trial court's findings and conclusions regarding Rose and Underwood's violation of Section 14 of Indiana's Uniform Fraudulent Transfer Act and their violation of Ind.Code § 35–43–5–4(8). However, we believe the trial court's award of attorney fees provides a windfall to Mercantile's counsel, and we remand for the court to calculate reasonable attorney fees.

Affirmed in part, reversed in part, and remanded with an instruction.

BARNES, J., concurs.

DARDEN, J., concurring in part and dissenting in part with separate opinion.

DARDEN, Judge, concurring in part and dissenting in part.

I respectfully dissent. I believe the trial court erred in allowing Mercantile to amend its complaint to add a third count, seeking treble damages and attorney's fees pursuant to Indiana Code section 34–24–3–1, Indiana's Property Crime Victim's Relief Act. Furthermore, I do not believe that there is evidence that Rose and Underwood's actions violated any criminal law. Accordingly, I also dissent as to the award of attorney's fees pursuant to Indiana Code section 34–24–3–1.

As articulated by the majority, the only issue presented in a proceedings supplemental is that of affording the judgment-creditor relief to which it is entitled under the terms of a judgment. *See Rice*, 782 N.E.2d at 1004. Similarly, the sole purpose of a fraudulent conveyance action is to remove obstacles preventing the enforcement of a judgment. *Id.* As such, neither a proceedings supplemental nor a fraudulent conveyance action creates a new, independent civil action. *See Borgman*, 681 N.E.2d at 217.

In this case, however, Mercantile seeks to pursue a new judgment, namely for an alleged violation of Indiana Code section 35–43–5–4(8), within the confines of a proceedings supplemental and fraudulent conveyance action. *See* I.C. § 34–24–3–1 ("If a person suffers a pecuniary loss as a result of a violation of IC 35–43 ... the person *may bring a civil action* against the person who caused the loss ....") (emphasis added). It is my opinion that bringing a new civil action, particularly one based upon an alleged criminal violation, within either a proceedings supplemental or fraudulent conveyance action is improper as the purpose of such actions is not to pursue an award in the form of a judgment; rather, the purpose is to recover a judgment to which a party already is entitled. Additionally, any recovery is limited to the *original* judgment, regardless of the amount allegedly conveyed or the manner in which it was conveyed. *See* I.C. § 32–18–2–18 (allowing that under this chapter, "the creditor may recover judgment for the value of the asset transferred ... or the amount necessary to satisfy the creditor's claim, whichever is less"); *see also* I.C. § 32–18–2–17 (providing that a creditor may obtain "[a]voidance of the transfer or obligation *to the extent necessary to satisfy the creditor's claim* ") (emphasis added).

Furthermore, even if Mercantile could properly seek a remedy under Indiana Code section 34–24–3–1, I do not agree

that Mercantile proved by the preponderance of the evidence that either Rose or Underwood committed a criminal act. Rose and Underwood testified that they did not immediately pay the judgment because an appeal was pending, and they were attempting to negotiate a settlement with Mercantile. Admittedly, Rose and Underwood may have demonstrated questionable business judgment and may have presented an unrealistic or "low-ball" settlement offer. Nonetheless, I find no evidence demonstrating that Rose and Underwood had the requisite mens rea for a violation of the fraud statute. *See Gilliana v. Paniaguas,* 708 N.E.2d 895, 899 (Ind. Ct.App.1999) ("It is this mens rea requirement that differentiates criminal conversion from the more innocent breach of contract or failure to pay a debt situation that the criminal conversion statute was not intended to cover."), *trans. denied.* Rather, Rose and Underwood were two shareholders, attempting to make a deal with a sophisticated business entity. The fact that the proposed offer was unsatisfactory to Mercantile does not make it criminal. To find so, I believe, would have a chilling effect on business transactions and dealings, which I do not believe is the intent of Indiana Code section 34–24–3–1. Moreover, I do not believe that the evidence shows that Rose and Underwood transferred the proceeds into their individual accounts in an attempt to conceal the proceeds from Mercantile. Rather, Underwood testified that he and Rose consulted an attorney, their auditor and an accountant regarding what to do with the proceeds of the sale. Underwood also testified that he believed that all he and Rose

could do was disperse the proceeds to Jasper's stockholders.[18]

Accordingly, I would reverse the trial court as to any award, including that of attorney's fees, under Indiana Code section 34–24–3–1.

---

18. Notably, Mercantile could have discovered the whereabouts of the proceeds, and in turn, made Rose and Underwood answer as to any obligation owing to Jasper by naming Rose and Underwood as garnishees in its proceedings supplemental. *See* Ind. Trial Rule 69(E). Instead, Mercantile waited eight months after its proceedings supplemental to file its fraudulent conveyance action against Rose and Underwood.